J-S28017-20

2020 PA Super 246

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| RASHAWN DAVID WILLIAMS | : | |
| | : | |
| Appellant | : | No. 1386 MDA 2019 |

Appeal from the Judgment of Sentence Entered December 17, 2018
In the Court of Common Pleas of Lycoming County Criminal Division at
No(s): CP-41-CR-0001442-2017

BEFORE:  BOWES, J., OLSON, J., and MUSMANNO, J.

OPINION BY OLSON, J.:                      **FILED OCTOBER 08, 2020**

Appellant, Rashawn David Williams, appeals from the judgment of sentence entered on December 17, 2018,[1] following his jury trial convictions for first-degree murder, two counts of aggravated assault, tampering with physical evidence, and obstruction of administration of law.[2]  Upon review, we affirm.

We summarize the facts and procedural history of this case as follows. On June 22, 2017, at approximately 1:10 a.m., Williamsport City Police responded to an emergency call regarding a stabbing at the corner of Locust Street and Center Place in Lycoming County, Pennsylvania.  N.T., 10/15/2018,

_____

[1]  Appellant's judgment of sentence was made final by the denial of his post-sentence motions on May 22, 2019.

[2]  18 Pa.C.S.A. §§ 2501(a), 2702(a)(1), 2702(a)(4), 4910, and 5101, respectively.

at 23-24. Police discovered "a white male, mid-30s laying on the sidewalk … bleeding heavily." *Id.* at 24. The investigating officer performed CPR after not finding the victim's pulse. *Id.* at 29. Emergency medical personnel also responded, but the victim died later at the hospital. *Id.* at 33.

Three unrelated eyewitnesses on the scene told police that just prior to the stabbing they heard someone repeatedly yelling, "Stop it. You're killing me." *Id.* at 47-83. Each of the eyewitnesses ran toward the screams until they came upon the bleeding victim who was lying on the street. *Id.* One of the eyewitnesses, John Miller, who was approximately 50 feet away from the incident, described a "scuffle" wherein the victim was on the ground, with another man standing over him. *Id.* at 47-51. Another witness, Travis McCarthy, who was in his apartment on Locust Street watching a movie, ran outside and toward the screams. *Id.* at 54-56. Although he did not see a weapon, McCarthy saw a "person [] on top of another" swinging both arms. *Id.* at 57. McCarthy could not identify the alleged attacker, but saw him run into a residence, later identified as 321 Locust Street, where Appellant lived. *Id.* at 57-58. McCarthy saw the victim lying in a pool of blood and yelled at the purported attacker to come back outside. *Id.* Beth Luckner who was outside gardening nearby also responded to the screams and saw the victim lying in a pool of blood. *Id.* at 72-73. She witnessed McCarthy yelling at the alleged attacker and pointing at the residence where he retreated. *Id.* at 73. Luckner called the police, waited for their arrival, and assisted with rendering aid to the victim. *Id.* at 74-75.

When police arrived, they surrounded the residence at 321 Locust Street. *Id.* at 81. Police apprehended Appellant on the back porch. *Id.* at 84. Appellant was visibly sweaty and dropped a cellular telephone when police arrested him. *Id.* at 85. When later told he was to be charged with homicide and related offenses, Appellant claimed the victim came into his home and that he had the right to defend himself and his family. *Id.* at 113.

In a subsequent search of Appellant's residence, police recovered a damaged knife from the kitchen sink. *Id.* at 163. The tip of the knife's blade was missing. *Id.* Police also testified that they smelled the strong odor of bleach and found a bucket of bleach water on the floor in the kitchen. *Id.* at 32 and 105. From the second floor, police recovered a man's slipper and white towels that appeared to be stained with blood. *Id.* at 158-163. Police additionally observed and collected samples of drops of blood on the living room television, inside and outside of the exterior front door threshold, and from the front porch. *Id.* at 164-165. There were broken spindles and traces of blood on the railing around the front porch. *Id.* at 123. In addition, police observed a plastic outdoor chair with bloodstains overturned in the yard. *Id.* at 124. Police also documented bloodstains on a wall leading to Locust Street where the victim was found. *Id.* at 127-129. The bloodstains were located approximately seven to eight feet from the ground, which police later described at trial as "cast off." *Id.*

In a subsequent autopsy, a forensic pathologist confirmed that the victim died as a result of 35 stab wounds to the face, neck, back, chest, arms,

and hands. N.T., 10/17/2018, at 104-135. The pathologist recovered a knife tip lodged in the victim's cheekbone. *Id.* at 116. A microscopic comparison of that knife tip with the knife blade recovered from Appellant's sink revealed "one entity before being fractured." N.T., 10/16/2018, at 93. Subsequent testing revealed the presence of the victim's DNA on the recovered bloody slipper, a bloody white towel found in a second floor bathroom, the blood found on the living room television, as well as inside and outside the threshold to the front door. *Id.* at 62-83. There was no blood found on the knife recovered from the sink. *Id.* at 39.

A six-day jury trial commenced on October 15, 2018 wherein the Commonwealth presented the aforementioned evidence. Appellant testified in his own defense. In his appellate brief, he summarizes his testimony as follows:

> The defense asserted that [Appellant] suffers from Post-Traumatic Stress Disorder [(PTSD)] and had been the victim of sexual assaults as a minor. He testified that [the victim] entered his home without his permission, grabbed [Appellant's] groin, and attempted to sexually assault him. [Appellant] grabbed a knife to scare him, but [the victim] kept coming at him. Then [Appellant] said he blacked out or went into a rage and did not recall stabbing [the victim] but acknowledged doing so.

Appellant's Brief at 8.

More specifically, Appellant avers he testified as follows:

> With respect to the events of the evening, Appellant testified that the decedent came through an unlocked door into his apartment [and] touched his thigh and [buttocks] without his permission. [Appellant] repeatedly asked the decedent to leave the residence, but he refused to do so, saying, "Pussy, I'm not leaving here until

I get what I want."  After saying this, the decedent touched [Appellant's] groin and when [Appellant] tried to swat his hand away, [the victim] sprayed mace at [Appellant], while repeatedly saying, "I'm not leaving until I get what I want."  A struggle ensued with the decedent touching [Appellant] in his "private area."  When [Appellant] went to the kitchen, the decedent threw a chair at [Appellant], and in response, [Appellant] picked up a knife to scare the decedent, but it didn't work and [Appellant] kept trying to push him away.   They continued to struggle when the decedent maced [Appellant] in the neck and chest, and a third time in the face.  It was at this point that [Appellant] stabbed the decedent for the first time.

Eventually, they ended up outside, because [Appellant] wanted the decedent out of the house, but when [Appellant] attempted to get back into the apartment, the decedent pulled on [Appellant's] shirt and he fell to the bottom of the steps, where the decedent threw a chair at him.  [Appellant] tried to ascend the stairs to get back into the apartment.  At that point, the decedent was grabbing [Appellant] by his lower half and had hold of his groin, and [Appellant] blacked out, and stabbed the decedent to get him away from him.  By this time, the two had fallen over the bannister of [Appellant's] front porch, and the decedent got up and walked across the street and collapsed, with [Appellant] following to make sure he didn't get up and come back after him.

*Id.* at 9-10 (record citations omitted).

To rebut Appellant's defense, at trial, the Commonwealth also presented evidence of a secret romantic relationship between Appellant and the victim. The victim's mother testified that her son was openly gay.  N.T., 10/15/2018, at 38.   The victim often wore women's capris pants, lipstick, and women's perfume and he regularly carried a purse.  *Id.* at 38-39.  Police recovered two cellular telephones from the victim – one on the street in a pool of the victim's blood and the other from inside the victim's purse.  N.T., 10/16/2018, at 122-123.  The victim's mother confirmed one of the victim's cellular telephone numbers.  N.T., 10/15/2018, at 38.  As previously mentioned, police also

- 5 -

recovered a cellular telephone that Appellant dropped on the back porch when he was apprehended. N.T., 10/16/2018, at 123. In an interview with police, Appellant confirmed his cellular telephone number. N.T., 10/17/2018, at 30-31. Police served search warrants on the cellular telephone service providers and obtained the records for all three cellular telephone numbers for the month prior to the stabbing. N.T., 10/16/2018, at 28-34. At trial, the Commonwealth presented evidence of specific text messages between Appellant and the victim. *Id.* at 47-55. During the month leading up to the incident, Appellant and the victim contacted each other 363 times. *Id.* at 44-45. The Commonwealth also presented records indicating that Appellant initiated lengthy, late-night conversations with the victim almost daily. N.T., 10/18/2018, at 58-60. The Commonwealth confronted Appellant with evidence of the internet browsing history from the cellular telephone associated with him, which showed searches for "shemale porn videos," "transvestite porn," "free gay porn," and "hermaphrodite porn." *Id.* at 80-82. Appellant denied conducting those internet searches and claimed that another roommate staying with him at the time had access to his cellular telephone. *Id.* at 67-68 and 80-82. Appellant, however, confirmed that audio call records showed that there were telephone calls from Appellant's cellular telephone to the victim immediately after the aforementioned internet searches. *Id.* at 80-82. Appellant denied having photographs depicting partially naked men stored on his cellular telephone. *Id.* at 68. Upon cross-examining Appellant, the Commonwealth presented evidence of a photograph of a man in a jock strap

retrieved from the images section of Appellant's cellular telephone. N.T., 10/19/2018, at 72-73. Appellant claimed that he was unaware that the photograph was stored on his cellular telephone. *Id.*

Additionally, two experts testified at trial -- Dr. Scott Scotilla and Dr. William Anthony Cox. Dr. Scotilla, an expert in forensic psychology, evaluated Appellant, diagnosed Appellant with Post-Traumatic Stress Disorder (PTSD), and testified about Appellant's history of physical and sexual abuse and neglect. N.T., 10/18/2018, at 147-218. Dr. Cox, a forensic pathologist and neuropathologist, testified regarding the toxicology report that was prepared as part of the victim's autopsy. N.T., 10/19/2018, at 34-60. The toxicology report indicated the presence of alcohol, Alprazolam (an antidepressant), Clonazepam (an anticonvulsant), amphetamines, methadone, cocaine, and tetrahydrocannabinol (THC, a metabolite of marijuana) in the victim's blood. *Id.* Dr. Cox explained the general effects of each of these substances. *Id.*

At the conclusion of trial, the jury convicted Appellant of the aforementioned crimes. On December 17, 2018, the trial court sentenced Appellant to life imprisonment without the possibility of parole for first-degree murder. The trial court imposed sentences of five to ten years of incarceration for aggravated assault,[3] one to two years of imprisonment for tampering with

---

[3] The trial court imposed a sentence for aggravated assault pursuant to 18 Pa.C.S.A. § 2702(a)(4) and determined that the other conviction for aggravated assault pursuant to 18 Pa.C.S.A. § 2702(a)(2) merged for sentencing purposes.

physical evidence, and one to two years of incarceration for obstruction of the administration of law.  The trial court imposed these sentences consecutively to the sentence for first-degree murder and to each other.  Appellant filed a timely post-sentence motion seeking a new trial and reconsideration of his sentence.  The trial court denied relief by order entered on May 22, 2019.  On June 3, 2019, the trial court issued an accompanying opinion for the reasons it denied relief.  This timely appeal resulted.[4]

On appeal, Appellant presents the following issues for our review:

I.      Did the trial court err in admitting text messages allegedly exchanged between the decedent and [Appellant]?

II.     Did the trial court err by permitting the Commonwealth to introduce a picture of a partially naked male found on [Appellant's] cell[ular] [tele]phone?

III.    Did the trial court err by limiting the testimony of defense experts based on the alleged inadequacy of expert reports?

IV.     Did the trial court err by permitting the Commonwealth crime scene processing expert to give a lay opinion about "cast off" blood pattern evidence when he had not been qualified as an expert in blood pattern evidence?

V.      May a witness who has been convicted of false identification be further impeached through evidence of numerous aliases?

VI.     Did the trial court err in excluding relevant rebuttal evidence?

---

[4]    Appellant filed a notice of appeal on June 4, 2019.  On June 5, 2019, the trial court ordered Appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b).  Appellant complied timely on June 12, 2019.  Pursuant to Pa.R.A.P. 1925(a), the trial court filed an opinion relying entirely upon its prior decision issued on June 3, 2019.

> VII.  Under the circumstances of this case, was [Appellant] entitled to jury instructions on both the [c]astle [d]octrine and [s]elf-[d]efense?

Appellant's Brief at 4.

Appellant's first six issues challenge various trial court evidentiary rulings.  We adhere to the following standard:

> The admissibility of evidence is a matter within the sound discretion of the trial court and will be reversed only where there is a clear abuse of discretion.  Our standard of review of a challenge to an evidentiary ruling is therefore limited.  Abuse of discretion is not merely an error of judgment, but rather where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will.

***Commonwealth v. Lekka***, 210 A.3d 343, 353–354 (Pa. Super. 2019) (internal citations and quotations omitted).

In the first issue presented on appeal, Appellant claims that the trial court abused its discretion by admitting the text messages between the victim and Appellant into evidence.  Appellant's Brief at 15-17.  More specifically, Appellant argues the trial court abused its discretion by admitting the text messages pursuant to the party-opponent exception to hearsay under Pa.R.E. 803(25).  ***Id.*** at 15.  He claims that "[w]hile the statements attributable to [Appellant] may be admissions by a party-opponent pursuant to Pa.R.E. 803(25), the statements attributed to the decedent were not." ***Id.***  Further, Appellant argues that while the trial court "opined that the texts were introduced by the Commonwealth to provide context to the [Appellant's]

- 9 -

texts[,]" the Commonwealth introduced the evidence to prove the truth of the matters asserted. *Id.* at 15-16. More precisely, Appellant argues:

> The Commonwealth spent a great deal of its argument focusing on the fact that there was a secret romantic and potentially sexual relationship between [Appellant] and [the victim], and a significant portion of the argument attempting to stress that [the victim] had been trying to end the relationship through the content of these text messages - clearly using the decedent's text messages for the truth of the matter asserted.
>
> This evidence was improperly admitted as hearsay, and was prejudicial to the trial of the case. The Commonwealth used what was written in the texts to presume what was going on in the remainder of the relationship between [the victim] and [Appellant], the content of phone calls between them and other aspects of their friendship. As a focal point of the Commonwealth's case, the introduction of the text messages was not harmless error.

*Id.* at 17-18.

The admissibility of electronic communications is to be evaluated on a case-by-case basis as any other document to determine whether or not there has been an adequate foundational showing of their relevance and authenticity. ***In the Interest of F.P.***, 878 A.2d 91, 96 (Pa. Super. 2005). In ***Commonwealth v. Koch***, 39 A.3d 996 (Pa. Super. 2011), as a matter of first impression, our Court examined: 1) the law pertaining to authentication of text messages and, 2) whether text messages constitute hearsay subject to exception. The ***Koch*** Court determined:

> Pennsylvania Rule of Evidence 901 provides that authentication is required prior to admission of evidence. The proponent of the evidence must introduce sufficient evidence that the matter is what it purports to be. Pa.R.E. 901(a). Testimony of a witness with personal knowledge that a matter is what it is claimed to be can be sufficient. Pa.R.E. 901(b)(1). ***See also*** comment, *citing*

- 10 -

***Commonwealth v. Hudson***, 414 A.2d 1381 (Pa. 1980). Furthermore, electronic writings typically show their source, so they can be authenticated by contents in the same way that a communication by postal mail can be authenticated. Circumstantial evidence may suffice where the circumstances support a finding that the writing is genuine. ***In the Interest of F.P.***, ***a Minor***, 878 A.2d 91 (Pa. Super. 2005).

\*        \*        \*

Importantly, in ***In the Interest of F.P***., ***a Minor***, ***supra***, we rejected the argument that e-mails or text messages are inherently unreliable due to their relative anonymity and the difficulty in connecting them to their author. ***Id.*** at 95. We reasoned that the same uncertainties existed with written documents: "A signature can be forged; a letter can be typed on another's typewriter; distinct letterhead stationary can be copied or stolen." ***Id.*** Concluding that electronic communications, such as e-mail and instant messages, can be authenticated within the framework of Pa.R.E. 901 and our case law, we declined to create new rules governing the admissibility of such evidence. We held that such evidence is to be evaluated on a case-by-case basis as any other document to determine whether there has been an adequate foundational showing of its relevance and authenticity.

\*        \*        \*

[…E]-mails and text messages are documents and subject to the same requirements for authenticity as non-electronic documents generally. A document may be authenticated by direct proof, such as the testimony of a witness who saw the author sign the document, acknowledgment of execution by the signer, admission of authenticity by an adverse party, or proof that the document or its signature is in the purported author's handwriting. ***See McCormick on Evidence***, §§ 219–221 (E. Cleary 2d Ed. 1972). A document also may be authenticated by circumstantial evidence, a practice which is "uniformly recognized as permissible." ***Commonwealth v. Brooks***, 508 A.2d 316 (Pa. Super. 1986) (*citing*, *e.g.*, ***Commonwealth v. Nolly***, 138 A. 836 (Pa. 1927) (letters authenticated by contents: facts known only to sender and recipient); ***Commonwealth v. Bassi***, 130 A. 311 (Pa. 1925) (unsigned letter authenticated by defendant's nickname written on it, along with contents indicating knowledge of matters familiar to both defendant-sender and

witness-recipient); and ***McFarland v. McFarland***, 107 A.2d 615, 616 (Pa. Super. 1954)).

As these cases illustrate, the difficulty that frequently arises in e-mail and text message cases is establishing authorship. Often more than one person uses an e-mail address and accounts can be accessed without permission. In the majority of courts to have considered the question, the mere fact that an e-mail bears a particular e-mail address is inadequate to authenticate the identity of the author; typically, courts demand additional evidence.

Text messages are somewhat different in that they are intrinsic to the cell[ular] [tele]phones in which they are stored. While e-mails and instant messages can be sent and received from any computer or smart phone, text messages are sent from the cellular phone bearing the telephone number identified in the text message and received on a phone associated with the number to which they are transmitted. The identifying information is contained in the text message on the cellular telephone. However, as with e-mail accounts, cellular telephones are not always exclusively used by the person to whom the phone number is assigned.

***Commonwealth v. Koch***, 39 A.3d 996, 1002–1005 (Pa. Super. 2011).

Moreover, in ***Koch***, we recognized:

Pennsylvania Rule of Evidence 801 defines hearsay as follows:

(a) Statement. A "statement" is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion.

(b) Declarant. A "declarant" is a person who makes a statement.

(c) Hearsay. "Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

Pa.R.E. 801. Additionally, Pa.R.E. 802 provides: "Hearsay is not admissible except as provided by these rules, by other rules prescribed by the Pennsylvania Supreme Court, or by statute." Pa.R.E. 802.

Arguably, [] text messages could [be] admitted under the exception to the Pennsylvania hearsay rule for admissions of a party opponent. *See* Pa.R.E. 803(25). However, [in order to constitute] party admissions [] the Commonwealth [must] prove [] author[ship].

*Id.* at 1006.

Finally, this Court noted that errors in admitting evidence may be deemed harmless:

An error may be deemed harmless, *inter alia*, where the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict. Harmless error exists when the error did not prejudice the defendant or the prejudice was *de minimis* or the erroneously admitted evidence was merely cumulative of other untainted evidence, which was substantially similar to the erroneously admitted evidence.

*Id.* at 1006–1007 (internal citation and quotation omitted).

Here, the trial court determined that "[t]here was no dispute that [Appellant] sent the text messages [and, i]n fact, [Appellant] testified about the text messages at trial." Trial Court Opinion, 6/3/2019, at 2. Upon review, we agree. Initially, we note that Appellant does not dispute the authenticity of the text messages. At trial, the Commonwealth presented Appellant with the phone logs and text messages at issue. N.T., 10/18/2018, at 28-30. Appellant confirmed that he had authored the text messages. *Id.* at 31 and 79. As previously mentioned, there was also evidence regarding the ownership of the cellular telephones. Appellant confirmed his cellular telephone number with police and it matched with the cellular telephone police recovered upon Appellant's arrest. The victim's mother confirmed the victim's

one cellular telephone number. Police recovered the other cellular telephone from the victim's purse located at the scene of the crime.

Upon review of Appellant's trial testimony, when confronted with the text messages at issue, it is clear that Appellant believed he was communicating with the victim. *Id.* Accordingly, we conclude that the Commonwealth properly authenticated the text messages between the victim and Appellant. In turn, having proven Appellant authored the text messages he forwarded to the victim, it was proper for the trial court to admit those text messages into evidence under the party-opponent exception to the rule against hearsay. The victim's responsive text messages were also properly admitted. As the trial court noted, "[t]he victim's text messages were not being offered for the truth of [their] content, but rather to put [Appellant's] text messages in context and to show his responses to the victim, which showed [Appellant's] state of mind and his anger towards the victim." Trial Court Opinion, 6/3/2019, at 3. We agree with that assessment. The Commonwealth simply did not attempt to prove that the victim acted in conformity with the messages he forwarded to Appellant or that the matters asserted within those messages were true. Indeed, the Commonwealth appears to have relied more upon the volume and frequency of the exchanges, not their content, to establish a relationship between Appellant and the victim. Lastly, Appellant neither identifies nor explains how or in what instances the Commonwealth introduced a specific text message sent by the victim to

Appellant to demonstrate the truth of the matter asserted therein. As such, Appellant is not entitled to relief on his first claim.

In his second issue presented, Appellant argues the trial court abused its discretion by admitting into evidence the "photograph found on [Appellant's] cell phone which depicted a partially nude male." Appellant's Brief at 17. Appellant objected to its introduction arguing the Commonwealth had not properly authenticated the photograph, as "there was no evidence of the context of the photograph, such as where the photograph came from, when it was accessed, and even whether [Appellant] had ever viewed the photograph. *Id.* Appellant claims the photograph was irrelevant, but also used impermissibly by the Commonwealth as collateral impeachment evidence against him. *Id.*

On this issue, the trial court determined the photograph at issue was properly authenticated and admissible, but that the jury was free to weigh the evidence. Trial Court Opinion, 6/3/2019, at 3-4. The trial court opined that "the Commonwealth was not trying to prove that [Appellant] took the photograph, that the photograph was an accurate representation of any particular person, or that [Appellant] was the one who put the photograph on the [cellular tele]phone." *Id.* at 4. The trial court noted there was no dispute that the cellular telephone belonged to Appellant. *Id.* Thus, it was proper for the Commonwealth "to prove that [Appellant] was not being truthful when he stated that no such photographs were on his [cellular tele]phone." *Id.*

Regarding authentication, as previously set forth, Pa.R.E. 901(a) provides that the proponent of the evidence must introduce sufficient evidence that the matter is what it purports to be. Pa.R.E. 901(a). The Commonwealth only alleged that there was a photograph depicting a man in a jockstrap recovered from Appellant's phone. Here, as described in detail above, there was ample evidence that the cellular telephone belonged to Appellant. Moreover, Appellant does not dispute that the photograph in fact depicts a man in a jockstrap. As such, the Commonwealth introduced sufficient evidence that the photograph was what it was purported to be. Accordingly, the Commonwealth properly authenticated the photograph and we discern no abuse of discretion in admitting it. Thereafter, it was for the jury to determine the weight of Appellant's testimony that he did not know about it, had not accessed it, and/or that someone else had access to his cellular telephone. *See Commonwealth v. Stays*, 70 A.3d 1256, 1267 (Pa. Super. 2013) ("The weight given to trial evidence is a choice for the factfinder."). Finally, even if there were error, it was harmless. Admitting the photograph was both *de minimus* and cumulative, in light of the properly admitted, and unchallenged, evidence of pornographic internet searches found on Appellant's cellular telephone as detailed above.

We turn now to Appellant's third appellate issue regarding the admission of expert evidence, which entails two subparts. As Appellant explains, he presented two defenses at trial – "heat of passion and self-defense."

Appellant's Brief at 18. In support, Appellant "presented the testimony of two experts: Dr. Scott Scotilla and Dr. William Anthony Cox." *Id.* As to each doctor, Appellant challenges the trial court's evidentiary rulings limiting the scope of their trial testimony.

Regarding Dr. Scotilla, Appellant notes that he is "a psychologist who testified regarding the heat of passion defense [and] had prepared a report which had been provided to the Commonwealth in discovery." *Id.* at 19. Appellant asserts:

> Dr. Scotilla was permitted to testify about [Appellant's] history of physical and sexual abuse and neglect, as well as testing which led him to a diagnosis of Post-Traumatic Stress Disorder (PTSD). He described symptoms of PTSD, including hypervigilance, overreaction and dissociation. [The trial court precluded Dr. Scotilla from] testify[ing] to a degree of psychological certainty that [Appellant's] behavior during the stabbing was consistent with his examination and diagnosis.

*Id.* Appellant claims the trial court limited Dr. Scotilla's testimony because "his report did not include a statement of the facts of the offense upon which he based his opinion, even though Dr. Scotilla did listen to [Appellant's] testimony at trial prior to his testimony[.] *Id.* at 19-20. Appellant acknowledges that an expert must state the facts upon which his opinion is based pursuant Pa.R.E. 705. *Id.* at 20. However, he argues he should have been permitted to ask Dr. Scotilla "to assume the truth of [Appellant's] testimony the expert ha[d] heard" or "to pose a hypothetical question" to Dr. Scotilla. *Id.* at 19-20, *citing* Pa.R.E. 705 Comment.

With regard to Dr. Cox, as Appellant recounts:

> Dr. Cox, a forensic pathologist/toxicologist, was called to testify regarding the effect of the various substances found in the decedent's system, and their combined effect on an individual's behavior. The defense proffered that Dr. Cox would testify that due to the multiple drugs used, the decedent would have acted in an aggressive way and could have been suffering from hallucinations, as had been stated within the expert report. Generally, the court permitted Dr. Cox to testify that the controlled substances in the victim's system were consistent with certain [conduct] such as bizarre behaviors and aggression, but Dr. Cox could not testify that was the way the victim acted on the night in question.

Appellant's Brief at 22.

On these somewhat related issues, the trial court limited both experts because their expert reports did not indicate specific, necessary facts upon which the doctors relied in rendering their opinions. With regard to Dr. Scotilla, the trial court noted that while his "report delved into [Appellant's] mental health history and diagnosis, it did not relate that information to the alleged facts of this incident, even in hypothetical form." Trial Court Opinion, 6/3/2019, at 6. "[Dr. Scotilla's report contained] no discussion of the facts that allegedly caused [Appellant] to act in the heat of passion." *Id.* Regarding Dr. Cox, the trial court "[g]enerally [] permitted Dr. Cox to testify that the controlled substances in the victim's system were consistent with certain [conduct] such as bizarre behaviors and aggression, but Dr. Cox could not testify that was the way the victim acted on the night in question as his report repeatedly indicated that the effects were dependent on the individual's experience with drugs." *Id.* at 7. The trial court concluded "Dr. Cox's report

did not include any facts regarding the victim's experience or [drug] use history." *Id.*

"If an expert states an opinion the expert must state the facts or data on which the opinion is based." Pa.R.E. 705. If a defendant intends to call an expert at trial, the trial court may require pretrial disclosure of a "report stating the subject matter on which the expert is expected to testify; the substance of the facts to which the expert is expected to testify; and a summary of the expert's opinions and the grounds for each opinion." Pa.R.Crim.P. 573(C)(2). Failure to comply allows the trial court "to prohibit [a] party from introducing evidence not disclosed, other than testimony of the defendant." Pa.R.Crim.P. 573(E). Moreover, in an unpublished memorandum decision,[5] a prior panel of this Court recently noted:

> Although there are no rules of procedure in criminal cases precisely governing the scope of expert trial testimony, it cannot be asserted that either the Commonwealth or a defendant has *carte blanche* to allow an expert to testify beyond the information contained in his or her report. ***Commonwealth v. Roles***, 116 A.3d 122 (Pa. Super. 2015). To hold otherwise would eviscerate the requirement that reports be disclosed. ***Id.*** In ***Commonwealth v. Stith***, 644 A.2d 193 (Pa. Super. 1994), this Court discussed the civil rules in the context of a criminal case.
>
> * * *
>
> Stith relied on Pa.R.C.P. 4003.5(c), and civil jurisprudence governing expert reports to argue that an expert is not permitted

---

[5] ***See*** Pa.R.A.P. 126(b) (providing that non-precedential decisions, referring to unpublished, memorandum decisions of the Superior Court filed after May 1, 2019, may be cited for their persuasive value).

to testify beyond the scope of his report. Rule 4003.5(c) states in pertinent part,

> (c) To the extent that the facts known or opinions held by an expert have been developed in discovery proceedings ... his direct testimony at trial may not be inconsistent with or go beyond the fair scope of his testimony in the discovery proceedings as set forth in his ... separate report ... However, he shall not be prevented from testifying as to facts or opinions on matters on which he has not been interrogated in the discovery proceedings.

Pa.R.C.P. 4003.5(c).

***Commonwealth v. Reeves***, 2019 WL 3383703, at *9 (Pa. Super. filed July 25, 2019) (unpublished memorandum)(footnote omitted).

In this case, we discern no error in limiting the testimony of Dr. Scotilla or Dr. Cox. The trial court limited the scope of each experts' trial testimony to the substance of the facts contained in their reports. Appellant does not dispute that Dr. Scotilla's report lacked a factual foundation of the events of the incident or that Dr. Cox's report did not rely upon information of the victim's drug use and experience. Instead, Appellant contends the trial court should have permitted the experts to assume facts heard at trial were true or to answer hypothetical questions. However, such actions would permit the experts to testify outside of the scope of their reports, which our procedural rules and relevant jurisprudence prohibit. Accordingly, for all of the foregoing reasons, we conclude the trial court did not err in limiting expert testimony.

In his fourth issue presented, Appellant asserts that the trial court erred by permitting Officer Joseph Ananea, the police officer and qualified expert

who processed the crime scene, to testify about "cast-off" blood spatter.

Appellant's Brief at 24-27.   More specifically, he argues:

> the Commonwealth was required to qualify Officer Ananea as an expert in blood pattern evidence, and moreover was not competent to testify to opinion as to how the blood was deposited in these locations. [Officer] Ananea was qualified as a crime scene processing expert, and not an expert in forensic science or blood pattern evidence. There was no expert report provided, nor testimony which would suggest that the officer's conclusion was consistent with generally accepted scientific principles.
>
> The manner in which the blood would have been found higher up on the wall was potentially relevant to the Commonwealth's case in trying to describe how the victim was stabbed, specifically in terms of what type of force was used. Therefore, the officer's testimony went far beyond merely describing where evidence was found or how it was collected, which was the scope of the officer's expertise in crime scene processing.

*Id.* at 26.   Accordingly, Appellant argues that the trial court abused its

discretion by allowing Officer Ananea to provide lay opinion testimony about

blood spatter.   Finally, on this issue, Appellant contends:

> This was not harmless error because [the blood evidence] was used by the Commonwealth to prove that the stabbing occurred not only within [Appellant's] home, but continued at the spot where the victim's body was found, and to ascribe a particularly violent or forceful action on the part of [Appellant] in wielding the knife, which was used to argue intent by the Commonwealth. Th[is] directly impacted the defenses of self-defense and heat of passion, and had a direct relation to the verdict of guilt on first[-]degree murder in this case. Had the [trial c]ourt excluded this testimony, the result would have been different.

*Id.* at 27.

> This Court previously determined:
>
> Based upon a plain meaning interpretation of [Pennsylvania Rules of Evidence 701, 702, and 704], when read *pari materia*, we conclude that the rules do not preclude a single witness from

- 21 -

testifying, or offering opinions, in the capacity as both a lay and an expert witness on matters that may embrace the ultimate issues to be decided by the fact-finder. Rule 702 permits an expert to testify to scientific, technical or other specialized knowledge beyond that possessed by a layperson. Rule 701 permits a layperson to testify in the form of an opinion, however, such testimony must be rationally based on that witness' perceptions. Thus, an expert must have additional specialized knowledge in rendering an opinion; whereas, a lay witness must form an opinion based upon his or her rationally based perceptions. The Rules, however, do not specifically delineate that a witness must be only one or the other. Instead, the witness' association to the evidence controls the scope of admissible evidence that he or she may offer. Furthermore, Pennsylvania Rule of Evidence 704 clearly permits both expert and lay opinion testimony on issues that ultimately must be decided by the trier of fact, in this case, the jury.

***Commonwealth v. Huggins***, 68 A.3d 962, 967 (Pa. Super. 2013).

Here, with the aid of a crime scene photograph, Officer Ananea testified that he saw blood droplets on a wall, seven to eight feet from the ground. N.T., 10/15/2018, at 128. The evidentiary rules permit him to offer an opinion as to how blood droplets were transferred to the site of their discovery based upon his personal perceptions. We discern no abuse of discretion in allowing Officer Ananea's testimony. Furthermore, his blood spatter analogy of "flailing around" a "wet paint brush" did not require expert knowledge. ***Id.*** We also note that Appellant had the opportunity to cross-examine Officer Ananea and did so by testing his theory using a different hypothetical example of blood "cast-off." N.T., 10/16/2018, at 6.

Moreover, we would conclude that any error in admitting the evidence was harmless. Despite Appellant's contentions, there was more than ample,

cumulative evidence showing the stabbing continued outside of Appellant's home. As set forth above, police recovered evidence of a trail of blood that led throughout Appellant's home, across the front door threshold, over the front porch, on a wall, and into the street. Three eyewitnesses saw and heard various aspects of the altercation. They all heard someone yelling, "Stop it. You're killing me." Two of the witnesses saw someone standing over the victim, swinging their arms, when the victim was lying in the street. Furthermore, we reject Appellant's suggestion that Officer Ananea's testimony prejudiced him by ascribing a particularly violent or forceful action on his part. Here, there was overwhelming evidence of the violent or forceful actions of Appellant. The victim endured 35 stab wounds and the attack resulted in the tip of the knife breaking off in the victim's face. The Commonwealth presented the autopsy results and photographs of the victim to the jury for their review. With this overwhelming additional evidence, we deem any error in permitting Officer Ananea's lay testimony harmless.

In his fifth issue presented, Appellant contends:

The Commonwealth [] introduced the testimony of Emerson Chase, who had seen the decedent a few hours before his death at a local bar. He testified that [the victim] was "intoxicated, but coherent." The defense sought to impeach [Mr.] Chase's credibility with the fact that he had a number of aliases listed on his [criminal record]. The defense cross-examined him about four of those [eleven] aliases before the Commonwealth objected, at which point the [trial] court held that this line of questioning was not relevant to his credibility and did not want to have a trial within a trial.

Appellant's Brief at 8. Appellant maintains that "[t]he use of multiple aliases in the context of falsifying his identity to law enforcement tends to prove that [Mr. Chase] was not credible, even to public officials, and weighs on his credibility as a witness." *Id.* at 20. As such, Appellant argues the trial court abused its discretion by prohibiting Appellant from questioning Mr. Chase about all of the aliases listed on his criminal record. On this issue, Appellant concludes,

> exclusion of this impeachment testimony was not harmless error because Emerson Chase was called to rebut significant portions of the defense, including those aspects involving the decedent's mental state or level of intoxication at the time of the killing. This evidence weighed directly on his credibility and was relevant for that purpose.

*Id.* at 21.

Here, the trial court permitted Appellant to question Mr. Chase about four of ten aliases allegedly used by Mr. Chase. N.T., 10/16/2018, at 101-102. Mr. Chase admitted that he used the four aliases. *Id.* The jury also heard that Mr. Chase "plead[] guilty to a count of false identification to law enforcement in 2007[.]" *Id.* at 101. Even without evidence of the purported use of additional aliases, the jury heard evidence that Mr. Chase was convicted of providing false identification to police and had used at least four aliases. Finally, we note that Mr. Chase testified about his personal perceptions of the victim's level of intoxication hours before the stabbing. However, as described at length above, Dr. Cox presented extensive testimony regarding the victim's toxicology report, the substances found in the victim's bloodstream, and the

general effects of each of those substances. Thus, we discern no abuse of discretion in limiting the questioning of Mr. Chase, but otherwise conclude any error was harmless. For all of the foregoing reasons, Appellant's fifth claim is meritless.

In his sixth issue presented, Appellant argues that the trial court erred by limiting his testimony regarding his intent to attend college. Appellant's Brief at 30-31. He claims:

> The Commonwealth objected to a question [regarding Appellant's] level of education. By way of proffer, [defense] counsel indicated that [Appellant] was making plans to attend college at Elmira Business Institute in the coming semester, that he was moving from the area.

*Id.* at 30. Appellant claims the testimony was relevant to rebut the Commonwealth's evidence, and theory of motive, that the victim sent text messages to Appellant stating he was ending their relationship. *Id.* Appellant claims the error was not harmless "because it hampered the defense effort to rebut the Commonwealth's motive." *Id.* at 31.

Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence and the fact is of consequence to determining the action. *See* Pa.R.E. 401. Here, the trial court determined that the proffered evidence was not relevant because evidence that Appellant was enrolled in college "did not make it more or less probable that [Appellant] was the person who stabbed the victim or that he did so intentionally, in self-defense or in the heat of passion." Trial Court Opinion, 6/3/2019, at 11.

We agree. Appellant's level of education was completely irrelevant to the crimes on trial. Furthermore, Appellant in fact testified that, at the time of the incident, he "was getting prepared to go to college[.]" N.T., 10/18/2018, at 67. Thus, although the trial court previously precluded the proffered evidence, the testimony came into evidence later. Therefore, any error in limiting Appellant's prior testimony was harmless. Appellant's sixth allegation is without merit.

Finally, in his last appellate issue, Appellant claims that the trial court erred by failing to instruct the jury separately on self-defense and the castle doctrine. Appellant's Brief at 31-34.

This Court recently stated:

> When a court instructs the jury, the objective is to explain to the jury how it should approach its task and the factors it should consider in reaching its verdict. In examining jury instructions, our standard of review is to determine whether the trial court committed a clear abuse of discretion or an error of law controlling the outcome of the case. A charge will be found adequate unless the issues are not made clear, the jury was misled by the instructions, or there was an omission from the charge amounting to a fundamental error. Moreover, in reviewing a challenge to a jury instruction the entire charge is considered, not merely discrete portions thereof. The trial court is free to use its own expressions as long as the concepts at issue are clearly and accurately presented to the jury.

*Commonwealth v. Bradley*, --- A.3d ---, 2020 PA Super 109 (Pa. Super. filed May 5, 2020) (internal citations, quotations, and original brackets omitted).

Our Supreme Court explained:

The traditional common law castle doctrine is a basic tenet of American law: The principle that a man's home is his castle is basic to our system of jurisprudence. The ideological foundation for the castle doctrine is the belief that a person's home is his castle and that one should not be required to retreat from his sanctum.

* * *

Although the castle doctrine has existed at common law in this Commonwealth essentially since its founding, it was not codified in Pennsylvania until 1972, with the enactment of 18 Pa.C.S.A. § 505. In enacting section 505, the legislature sought "to codify existing case law pertaining to 'self-defense' and to cover in a single rule the law governing the use of defensive force." 18 Pa.C.S.A. § 505 (amended June 28, 2011), Official Comment 1972. […] Section 505 set forth the circumstances under which the use of force for purposes of self-defense was justified, and addressed the use of deadly force [codifying the castle doctrine] specifically in subsection (b)(2).

**Commonwealth v. Childs**, 142 A.3d 823, 829 (Pa. 2016).

In pertinent part, Section 505(a) provides as follows. "The use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion." 18 Pa.C.S.A. § 505(a). Additionally, relevant here, Section 505(b) presently provides:

**(b) Limitations on justifying necessity for use of force.—**

* * *

(2) The use of deadly force is not justifiable under this section unless the actor believes that such force is necessary to protect himself against death, serious bodily injury, kidnapping or sexual intercourse compelled by force or threat; nor is it justifiable if:

(i) the actor, with the intent of causing death or serious bodily injury, provoked the use of force against himself in the same encounter; or

(ii) the actor knows that he can avoid the necessity of using such force with complete safety by retreating, except the actor is not obliged to retreat from his dwelling or place of work, unless he was the initial aggressor or is assailed in his place of work by another person whose place of work the actor knows it to be.

(2.1) […A]n actor is presumed to have a reasonable belief that deadly force is immediately necessary to protect himself against death, serious bodily injury, kidnapping or sexual intercourse compelled by force or threat if both of the following conditions exist:

(i) The person against whom the force is used is in the process of unlawfully and forcefully entering, or has unlawfully and forcefully entered and is present within, a dwelling, residence or occupied vehicle; or the person against whom the force is used is or is attempting to unlawfully and forcefully remove another against that other's will from the dwelling, residence or occupied vehicle.

(ii) The actor knows or has reason to believe that the unlawful and forceful entry or act is occurring or has occurred.

* * *

(2.5) […A] person who unlawfully and by force enters or attempts to enter an actor's dwelling, residence or occupied vehicle or removes or attempts to remove another against that other's will from the actor's dwelling, residence or occupied vehicle is presumed to be doing so with the intent to commit:

(i) an act resulting in death or serious bodily injury; or

(ii) kidnapping or sexual intercourse by force or threat.

18 Pa.C.S.A. § 505(b)(2), (2.1), and (2.5).

At trial, the trial court instructed the jury as follows:

- 28 -

The evidence in this case presents the question of whether [Appellant] acted in self-defense when he stabbed [the victim]. Self-defense is called justification in the law of Pennsylvania. If [Appellant's] actions were justified you can find him not guilty beyond a reasonable doubt.

To carry its burden of proving that [Appellant's] use of deadly force was not justifiable self-defense in this case, the Commonwealth must prove one of the following elements beyond a reasonable doubt. One, that at the time [Appellant] used the deadly force [Appellant] did not actually believe that he was in danger of immediate sexual intercourse compelled by force or threat from [the victim], such that [Appellant] needed to use deadly force to defend himself at that moment; or, that while [Appellant] actually believed he needed to use such force, his belief was unreasonable in light of all the circumstances known to him. In making this determination you must understand that the law presumes [Appellant] to have a reasonable belief that deadly force is immediately necessary to protect himself against sexual intercourse compelled by force or threat if both of the following conditions exist:

The person against whom the force is used is in the process of unlawfully and forcibly entering, or has unlawfully and forcefully entered and is present within a dwelling or residence, or the person against whom the force is used is or attempting to remove another person against that other person's will from the dwelling or residence; and [Appellant] kn[e]w or had reason to believe that the unlawful and forceful entry or act is occurring or had occurred.

A dwelling means any portion of a building or structure, including any attached porch, deck, or patio, even though it is moveable, for -- which is, for the time being, the home or place of lodging of [Appellant]. Forcefully means by act of such violence or threat, gesture, sign or menace, as may give ground to apprehended personal injury or danger in standing in defensive possession. Actual violence is not needed, but the conduct must be calculated to alarm the most timid. Opening an unlocked door is not sufficient in and of itself. In fact, the law further presumes that someone who unlawfully and by force enters or attempts to enter [Appellant's] dwelling or residence – or removes or attempts to remove someone against their will from the residence, is acting with the intent to commit an act resulting in sexual intercourse by force or threat.

Let me just reread that to you so it makes sense. In fact, the law presumes that someone who unlawfully and by force enters or attempts to enter [Appellant's] dwelling or residence, is acting with intent to commit an act resulting in sexual intercourse by force or threat. If [Appellant] knows or has reason to believe that this unlawful and forceful entry or act is occurring or has occurred, then the law presumes that [Appellant's] belief in the necessity of using deadly force is reasonable and justified.

Keep this in mind. A person is justified in using deadly force against another not only when they are in actual danger of unlawful attack, but also when they mistakenly but reasonably believe that they are. A person is entitled to estimate the necessity for the force he employs under the circumstances as he reasonably believes them to be at the time. In the heat of conflict a person who has been attacked ordinarily has neither time nor composure to evaluate carefully the danger and make nice judgments about exactly how much force is needed to protect himself.

* * *

Consider the realities of the situation faced by [Appellant] here when you assess whether the Commonwealth proved beyond a reasonable doubt either that he did not believe he was actually in danger of sexual intercourse by force or threat to the extent that he needed to use such force in self-defense, or that while he did believe, that his belief was unreasonable.

[Appellant] – the parties talked about the duty to retreat or no duty to retreat. The Commonwealth must also prove [Appellant] had a duty to retreat instead of using deadly force, and did not fulfill that duty. A duty to retreat arises where [Appellant] knows that he could avoid the necessity of using deadly force with complete safety by retreating. However, there are certain exceptions to this duty to retreat.

[Appellant] is not obliged to retreat from his dwelling unless he was the initial aggressor. If the Commonwealth proves one of these elements beyond a reasonable doubt, the actions of [Appellant] in using deadly force are not justified. If the Commonwealth fails to prove these elements [Appellant's] action was justified, and you must find him not guilty[.]

N.T., 10/22/2018, at 144-148.

- 30 -

We conclude that the trial court's instruction was a clear and accurate representation of the law pertaining to self-defense and the castle doctrine. Although Appellant urged the trial court to separate its instruction for the two defenses, it was unwarranted. As previously mentioned, Section 505 codified the law governing the use of defensive force into a single rule. Thus, it covers both self-defense generally and the castle doctrine specifically. Here, the trial court's single jury instruction closely tracked the statutory language of Section 505. Upon review, we conclude that the instruction was an adequate representation of the law. "It is well settled that the jury is presumed to follow the trial court's instructions." **Commonwealth v. Cash**, 137 A.3d 1262, 1280 (Pa. 2016). As such, we conclude that Appellant's final appellate issue does not entitle him to relief.

Judgment of sentence affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 10/8/2020