J-S11027-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| RICHARD HACK | : | |
| | : | |
| Appellant | : | No. 1273 EDA 2022 |

Appeal from the Judgment of Sentence Entered April 28, 2022
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0003075-2020

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| RICHARD HACK | : | |
| | : | |
| Appellant | : | No. 1274 EDA 2022 |

Appeal from the Judgment of Sentence Entered April 28, 2022
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0003106-2020

BEFORE: OLSON, J., McLAUGHLIN, J., and KING, J.

MEMORANDUM BY McLAUGHLIN, J.: **FILED JUNE 14, 2023**

Richard Hack appeals from the judgment of sentence entered after a

jury found him guilty of first-degree murder, conspiracy to commit first-degree

murder, persons not to possess a firearm, firearms not to be carried without

a license, and carrying firearms on public streets in Philadelphia.[1] Hack

challenges the sufficiency of the evidence and evidentiary rulings. We affirm.

The trial court sets forth the following facts:

> In April of 2020, [Hack] sold drugs on the corner of Chew and East Locust Avenue outside of Sijo Deli Grocery at 5660 Chew Avenue in Philadelphia. On April 14, 2020, at approximately 9:28 a.m., surveillance footage shows [Hack] and Yassiyn Brown ("Brown") standing outside of Sijo Deli. Two minutes later, [Hack] left the corner and three minutes later, returned with Abdul Ross ("Ross"). At approximately 9:34 a.m., the decedent, Sean Washington, walked up to the entrance. Immediately, Ross and the decedent walked west on East Locust Avenue until they were outside the view of the surveillance cameras.

> After seeing the decedent approach the entrance of Sijo Deli, [Hack] and Brown immediately went into Sijo Deli and approximately fifteen seconds later, left Sijo Deli together. Brown walked over to his grey Kia Soul parked on East Locust Avenue, roughly five yards from the entrance of Sijo Deli, and retrieved a firearm from the hood of the car, gave it to [Hack], and then walked back to the entrance of Sijo Deli on Chew Avenue.

> [Hack] walked west on East Locust Avenue towards the decedent until he was out of camera view, only to return to Brown's car roughly fifteen seconds later. Brown returned to his car, gave gloves to [Hack], and then walked west on

---

[1] 18 Pa.C.S.A. §§ 2502(a), 903(a), 6105(a)(1), 6106(a)(1), and 6108, respectively.

The jury convictions are docketed at CP-51-CR-0003075-2020 ("murder docket"). At docket CP-51-CR-0003106 ("PWID docket"), Hack entered a negotiated guilty plea to possession with intent to deliver a controlled substance, 35 P.S. § 780-113(a)(30), and was sentenced to two to four years' imprisonment. The sentencing at both dockets occurred on the same day. Hack filed a timely notice of appeal at both dockets, but filed a Rule 1925(b) statement at only the murder docket. On appeal, he does not raise any issues related to the PWID docket.

East Locust Avenue in the same direction as the decedent. [Hack] put the gloves on then once more walked out of camera view towards the decedent. Approximately fifty-five seconds later, at 9:36:50 a.m., the surveillance footage shows two unknown individuals, who were previously standing outside the entrance of Sijo Grocery, suddenly run north on Chew Avenue away from Sijo Deli. Ten seconds later, Brown and Ross walk back into camera view and are shown getting into Brown's car together before driving away.

After they heard gunshots, nearby police officers responded to the scene two minutes later and found the decedent at the intersection of East Locust Avenue and Crowson Street, about three row homes away from Sijo Deli. Police officers transported the decedent to the hospital, where he was declared dead.

Police officers attempted to interview individuals at the scene about the shooting and one woman, who initially refused to speak with police and identified only as Paula, stated that people were "selling drugs out on Chew and Locust."

From the scene, the Crime Scene officers recovered one projectile approximately eleven feet from the decedent's body and the decedent's pink semi-automatic firearm. Police officers recovered surveillance footage from Sijo Deli's three cameras. The cameras show the side of Sijo Deli on East Locust Avenue and Chew Avenue and the inside of the store.

The day of the incident, [Hack], Brown, and Ross were identified by Police Officers Raheem Williams and [Gabriel Soto] from the surveillance footage. At 5:40 p.m., Officer Williams arrested [Hack] walking west on East Locust Avenue, about twenty feet away from the intersection, wearing the same clothes in the video. When [Hack] was arrested, police recovered [Hack's] cell phone and clothing. [Hack's] clothing later tested positive for gunshot residue.

After he was given his Miranda rights, [Hack] acknowledged he was familiar with the area, knew the limitations of the surveillance cameras, and admitted that he sells marijuana at that intersection every day. While he admitted that Brown gave him a firearm, [Hack] claimed that he saw the

- 3 -

decedent get into an argument with an unknown male and only retrieved the firearm to intervene in the argument.

The police prepared a search warrant for [Hack's] cellphone and [Hack] provided the passcode to the police. At 10:24 a.m., less than an hour after the shooting, [Hack] read a text message from a contact listed as "Stanka Da Wife" which said "I'm glad you're okay, but you always getting your hands dirty for them. Why they can't put in they own work?" [Hack] responded with two text messages that said "Stank, the situation was too fast" and "I'm sorry. But I'm not gone get in no trouble."

At 11:55 a.m. and 1:19 p.m., [Hack] sent unknown individuals a screenshot of an article about the shooting posted to the Instagram page "unsolvedmurdersinphilly." The Instagram article was titled "Man, 38, fatally shot in broad daylight in East Germantown" and contained a photograph of the crime scene showing two officers standing over the decedent's firearm. [Hack's] phone contained three edited versions of the screenshot of the article that were edited the day of the incident at 5:10 p.m. The first photo cropped the screenshot to only include the officers and a portion of the article title. The second photo added markings to the photo by circling the decedent's firearm on the ground. The third photo zoomed into the handgun further and cropped out the top half of the officers.

The Medical Examiner determined that the cause of death was multiple gunshot wounds, and the manner of death was a homicide. The decedent was shot three times in the lower back and once in the upper thigh. The Medical Examiner recovered three .38 and .357 caliber projectiles from the decedent's body.[2]

> [2] When the decedent received treatment at the hospital, a doctor made a thoracotomy incision which could have cut through an exit wound or caused a fourth projectile to be lost.

At the time of the incident, [Hack] did not have a license to carry a firearm.

Trial Court Opinion, filed Aug. 24, 2022, at 2-5 (internal citations to record omitted).

Relevant to this appeal, Officer Williams and Officer Soto testified that when they observed the video from the surveillance cameras, they recognized Hack. N.T., Apr. 20, 2022, at 119, 127. Hack did not object to this testimony. *Id.*

Further, Detective Thorsten Lucke testified that from the raw surveillance video, he prepared a compilation video, which he narrated for the jury. *Id.* at 185. His testimony included describing the area where the incident occurred, pointing out individuals and items they carried or wore, identifying the individuals in the video, putting still photos on top of the video, and "drawing attention to the mannerisms" and hands of the individuals. *Id.* at 187-195.

Prior to trial, Hack filed a motion in limine to preclude narration of any video. He argued police had insufficient personal knowledge of Hack and his appearance from which they could make a reliable identification, and no independent testimony established the events depicted in the video. Motion in Limine, filed Jan. 31, 2022, at ¶¶ 6-7. Further, partway through Lucke's testimony, Hack objected to the indicators included in the commentary and twice objected to "anymore commentary." The court overruled the objections. N.T. at 188, 193, 195.

Detective Lucke also testified about the text messages sent between "Stanka da Wife" and Hack. Hack objected to the admission of the message

from "Stanka da Wife" as hearsay. *Id.* at 209. The court admitted the text message but informed the jury it was not "offered for the truth of the matter, but in order to understand the context with which it is alleged that the defendant responded to the message." *Id.* It instructed the members of the jury that they "ha[d] to see or hear the message itself so you understand what the response is. But, again, it is not for the truth of the matter." *Id.*

The jury found Hack guilty as set forth above, and the trial court sentenced Hack to life without parole for the first-degree murder conviction and 9½ to 19 years' imprisonment for the conspiracy conviction, with no further penalty for the firearm convictions. Hack did not file a post-sentence motion. He filed a timely notice of appeal.

Hack raises the following issues:

> 1. Did the [t]rial [c]ourt err in allowing Detective Lucke to narrate a video and identify Hack in it?
>
> 2. Did the [t]rial [c]ourt err in allowing Detective Lucke to read in front of the jury texts between "Stanka Da Wife" and Hack?
>
> 3. Was the evidence insufficient to prove the identity of the shooter beyond a reasonable doubt and therefore the conviction for all charges should be vacated?

Hack's Br. at 3-4 (suggested answers omitted).

We will first address Hack's claim that the Commonwealth failed to present sufficient evidence to prove the identity of the shooter. He points out that there were no eyewitnesses and claims that "a prosecution based substantially upon surveillance footage should be found insufficient." Hack's

Br. at 14. He notes that Officers Soto and Williams did not explain how they knew the person in the video was Hack and that no firearm was recovered. He argues that the medical examiner testified the victim was shot with two different types of bullets, such that he likely was shot by two separate people, but the Commonwealth failed to present sufficient evidence that one of those shooters was Hack.

When reviewing a challenge to the sufficiency of the evidence, we "must determine whether the evidence admitted at trial, and all reasonable inferences drawn therefrom, when viewed in a light most favorable to the Commonwealth as verdict winner, support the conviction beyond a reasonable doubt." **Commonwealth v. Feliciano**, 67 A.3d 19, 23 (Pa.Super. 2013) (*en banc*) (citation omitted)). "Where there is sufficient evidence to enable the trier of fact to find every element of the crime has been established beyond a reasonable doubt, the sufficiency of the evidence claim must fail." **Id.** (citation omitted). This standard applies equally where the Commonwealth's evidence is circumstantial. **Commonwealth v. Patterson**, 180 A.3d 1217, 1229 (Pa.Super. 2018).

"To sustain a conviction for first-degree murder, the Commonwealth must prove that: (1) a human being was unlawfully killed; (2) the accused was responsible for the killing; and (3) the accused acted with malice and a specific intent to kill." **Commonwealth v. Williams**, 176 A.3d 298, 306-07 (Pa.Super. 2017) (citing **Commonwealth v. Ballard**, 80 A.3d 380, 390 (Pa. 2013)).

Here, the Commonwealth presented video of Hack near the scene of the crime, wherein he obtained a firearm and gloves before the shooting occurred. Hack was identified from the video by two police officers. Although he denied being one of the shooters, Hack admitted that he was at the scene of the crime and that Brown gave him a firearm. Moreover, Hack had gunshot residue on his clothing, had edited pictures of an article about the shooting on his phone, and his text messages to Stanka Da Wife suggested that he had done something but would not get in trouble. This evidence was sufficient to support a conclusion beyond a reasonable doubt that Hack shot the victim.

In his remaining two issues, Hack challenges the trial court's evidentiary rulings. This Court will reverse an evidentiary ruling only if the trial court abused its discretion. **Commonwealth v. Hernandez**, 230 A.3d 480, 489 (Pa.Super. 2020) (citation omitted). An abuse of discretion is "not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record." **Commonwealth v. Antidormi**, 84 A.3d 736, 749 (Pa.Super. 2014) (quoting **Commonwealth v. Weakley**, 972 A.2d 1182, 1188-89 (Pa.Super. 2009)).

First, Hack argues this Court should grant a new trial because Detective Lucke's testimony "included an argumentative commentary overtop of a manipulated and persuasive-style presentation of the video evidence." Hack's Br. at 8. He claims the testimony deprived him of a fair trial, under the Sixth and 14th Amendments to the United States Constitution. Hack argues

Detective Lucke lacked personal knowledge of the shooting incident, such that his narration of the video was "mere commentary." *Id.* at 9. He argues the testimony was not harmless because without it the jury may have reached a different verdict. He claims the trial court misapplied *Commonwealth v. Cole*, 135 A.3d 191 (Pa.Super. 2016), reasoning that here the testimony was not a mere explanation but rather "a prejudicial presentation that included still-photos overtop the video for 'comparison.'" Hack's Br. at 10. He argues the testimony was designed to persuade the jury that Hack was the person in the video and "impermissibly suggested to the jury that Hack was pictured with a gun," noting that Detective Lucke drew attention to the person's mannerisms and their hands. *Id.* at 10.

He distinguishes the testimony here from the detective's testimony in *Cole*. He further attempts to distinguish *Cole* by stating that in *Cole* multiple eyewitnesses had placed the defendant at the scene, whereas here no eyewitnesses testified. Hack further argues that the Pennsylvania Rules of Evidence require an underlying basis and background for a declarant to identify a person in a piece of media, and Officers Soto and Williams had insufficient personal knowledge of Hack and his appearance from which the police could make an identification, and their testimony does not explain their personal knowledge of Hack. Hack also distinguishes *Commonwealth v. Brown*, 134 A.3d 1097, 1106 (Pa.Super. 2018), arguing *Brown* also had eyewitness testimony, and *Commonwealth v. Palmer*, 192 A.3d 85

(Pa.Super. 2018), noting that in that case DNA evidence confirmed the defendant's presence at the scene.

The admission of videotaped evidence "depends on relevance and probative value." *Cole*, 135 A.3d at 194. "Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact more or less probable, or supports a reasonable inference or presumption regarding a material fact." *Id.* at 194-95 (citation omitted).

In *Cole*, a police detective narrated video footage from security cameras that showed three individuals leave an apartment and walk out of view, the victim then staggering and falling to the ground, and the same three individuals running away and fleeing in a vehicle. *Id.* at 192. The detective

> pointed out the time stamp at various points in the video; he described the location of the cameras to the scene, the physical relationships between people and buildings, and the movements of a vehicle; he identified three men leaving an apartment and running along the fence line and the victim staggering and falling down. Using measurements he and his colleague took, the video footage, and the time stamps, [the detective] calculated the direction, distance, and time covered by the three individuals.

*Id.* at 196 (internal citations to record omitted).

On appeal, the defendant claimed the court erred in allowing the detective to narrate the video while it played, claiming the testimony was based on speculation, not personal knowledge, it contained improper lay opinion, and the danger of unfair prejudice outweighed the narration's probative value. *Id.* at 195. We concluded the trial court did not abuse its discretion in admitting the narration. We reasoned the testimony was based

- 10 -

on the detective's experience, perceptions, and his personal knowledge of the scene, the testimony was relevant to the jury's understanding of the timing, the actors, and the location of the events depicted. We further concluded that his testimony did not cause unfair prejudice or undue delay, confuse the issues, mislead the jury, or needlessly present cumulative evidence. *Id.* at 196.; *see also Brown*, 134 A.3d at 1106 (finding court did not err in allowing detective to describe images in video and call attention to specific portions of video); *Palmer* , 192 A.3d at 101 (court did not abuse its discretion in admitting detective's identification of shooter from video, which was based on his perception of the video and placed his action in context, and noting the jury watched the video and was free to reach a different conclusion).

Here, the trial court explained that precedents permit a witness to narrate a compilation of surveillance videos to aid the jury in understanding the timing, actors, and location. Tr.Ct.Op. at 7 (citing *Cole*, 135 A.3d at 106). It noted that it instructed the jury that it is their recollections, not the detective's narration, that controls. *Id.* The court found the detective described where people were in relation to the events and described the events as they unfolded, but noted that the jury was free to reach a different conclusion if it disagreed with Detective Lucke. *Id.* The court pointed out that in its final instructions, it again instructed the jury that it is the jury's recollection that controls, not Detective Lucke's narration.

The trial court did not abuse its discretion by allowing Detective Lucke to narrate the video. As in *Cole*, the narration was relevant, as it helped the

jury, and its prejudicial impact did not outweigh its probative value. Further, again as in **Cole**, the testimony was not the only evidence to identify Hack. Rather, two witnesses identified Hack as at the scene and Hack told the police officers that he was there and that Brown gave him a firearm. To the extent Hack challenges on appeal the identifications made by Officers Williams and Soto, he waived this challenge by failing to object at the trial. Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal"). Further, the court instructed the jury that it was their recollection that controlled, and the jury is presumed to follow the court's instruction. **See Commonwealth v. Hairston**, 249 A.3d 1046, 1068 (Pa. 2021). We cannot find the court abused its discretion.

In his next issue, Hack argues the introduction of the text message that was sent by his purported wife violated his right to confront witnesses and his right to a fair trial. He claims that the text message from "Stanka Da Wife" that Detective Lucke read to the jury was inadmissible hearsay. He points out the text was not from a co-conspirator (and thus admissible) and claims the text messages do not show his state of mind. He attempts to distinguish **Commonwealth v. Williams**, 241 A.3d 1094, 1101 (Pa.Super. 2020), because there, the text was between the defendant and the victim. Hack points out that the writer of the text (*i.e.*, "Stanka Da Wife") did not testify at trial. He maintains that the text was offered to prove the truth of the matter asserted, not the context of Hack's response, as argued by the Commonwealth. He argues his response was not a direct response or reply to

the text message, and the messages stand alone, with no context needed. He claims the text about "dirty work" was offered to prove he "did something dirty." Hack's Br. at 14.

Hearsay is an out-of-court statement offered "to prove the truth of the matter asserted in the statement." Pa.R.E. 801(c). "Hearsay statements are generally inadmissible unless they fall under an enumerated exception." ***Commonwealth v. Busanet***, 54 A.3d 35, 68 (Pa. 2012); Pa.R.E. 802. "An out-of-court statement is not hearsay when it has a purpose other than to convince the fact finder of the truth of the statement." ***Busanet***, 54 A.3d at 68.

Further, "an erroneous ruling by a trial court on an evidentiary issue does not require us to grant relief where the error was harmless." ***Commonwealth v. Chmiel***, 889 A.2d 501, 521 (Pa. 2005). An error is harmless "only if the appellate court is convinced beyond a reasonable doubt that the error is harmless." ***Commonwealth v. Fitzpatrick***, 255 A.3d 452, 483 (Pa. 2021) (quoting ***Commonwealth v. Story***, 383 A.2d 155, 162 (Pa. 1978)). The Commonwealth bears the burden of proving that the error was harmless beyond a reasonable doubt. ***Id.*** Harmless error exists where: "(1) the error did not prejudice the defendant or the prejudice was *de minimis*; (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant

by comparison that the error could not have contributed to the verdict." *Id.* (quoting *Chmiel*, 889 A.2d at 521).

Here, the trial court concluded the text message from "Stanka Da Wife" was not hearsay because it was not offered for the truth of the matter asserted. Tr.Ct.Op. at 8. It reasoned the message was admitted to show the context of the response. *Id.* (citing *Williams*, 241 A.3d at 1103-04). The court further pointed out that to "prevent any possible prejudice to [Hack], [the c]ourt instructed the jury that the statement was not offered for the truth of the matter asserted and was only admitted . . . to understand the context in which [Hack] responded to the message." *Id.*

The trial court did not abuse its discretion in admitting the message from "Stanka Da Wife," as it was not admitted for its truth. Rather, it was offered to provide context for Hack's response, which was admissible as the statement of a party opponent. *See* Pa.R.Evid. 801, 803(25). Furthermore, any error in admitting it was harmless, as any prejudice was *de minimis* and the text message would not have contributed to the outcome. *See Chmiel*, 889 A.2d at 529 (concluding improper line of question was harmless because it did not prejudice appellant or any prejudice was *de minimis*); *Commonwealth v. Fransen*, 42 A.3d 1100, 1115 (Pa.Super. 2012) (*en banc*) (finding evidentiary error harmless where there was overwhelming evidence of guilt). Moreover, the court issued a limiting instruction that the statement was not offered for the truth of the matter asserted but only to provide context for Hack's

response, and juries are presumed to following the court's instructions. **See**

**Hairston**, 249 A.3d at 1068.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 6/14/2023