J-S08043-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| RASHAWN DAVID WILLIAMS | : | |
| | : | |
| Appellant | : | No. 1377 MDA 2023 |

Appeal from the PCRA Order Entered September 28, 2023
In the Court of Common Pleas of Lycoming County Criminal Division at
No(s): CP-41-CR-0001442-2017

BEFORE: OLSON, J., MURRAY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.: **FILED: APRIL 22, 2024**

Appellant, Rashawn David Williams, appeals from the order entered in the Court of Common Pleas of Lycoming County dismissing his first petition filed under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-9546. After careful consideration, we affirm.

This Court has previously set forth the relevant facts and procedural history of Appellant's underlying homicide case as follows:

> On June 22, 2017, at approximately 1:10 a.m., Williamsport City Police responded to an emergency call regarding a stabbing at the corner of Locust Street and Center Place in Lycoming County, Pennsylvania. N.T., 10/15/2018, at 23-24. Police discovered "a white male, mid-30s laying on the sidewalk ... bleeding heavily." *Id.* at 24. The investigating officer performed CPR after not finding the victim's pulse. *Id.* at 29. Emergency medical personnel also responded, but the victim died later at the hospital. *Id.* at 33.

---

[*] Former Justice specially assigned to the Superior Court.

Three unrelated eyewitnesses on the scene told police that just prior to the stabbing they heard someone repeatedly yelling, "Stop it. You're killing me." *Id.* at 47-83. Each of the eyewitnesses ran toward the screams until they came upon the bleeding victim who was lying on the street. *Id*. One of the eyewitnesses, John Miller, who was approximately 50 feet away from the incident, described a "scuffle" wherein the victim was on the ground, with another man standing over him. *Id.* at 47-51. Another witness, Travis McCarthy, who was in his apartment on Locust Street watching a movie, ran outside and toward the screams. *Id.* at 54-56. Although he did not see a weapon, McCarthy saw a "person [ ] on top of another" swinging both arms. *Id.* at 57. McCarthy could not identify the alleged attacker, but saw him run into a residence, later identified as 321 Locust Street, where Appellant lived. *Id.* at 57-58. McCarthy saw the victim lying in a pool of blood and yelled at the purported attacker to come back outside. *Id*. Beth Luckner who was outside gardening nearby also responded to the screams and saw the victim lying in a pool of blood. *Id.* at 72-73. She witnessed McCarthy yelling at the alleged attacker and pointing at the residence where he retreated. *Id.* at 73. Luckner called the police, waited for their arrival, and assisted with rendering aid to the victim. *Id.* at 74-75.

When police arrived, they surrounded the residence at 321 Locust Street. *Id.* at 81. Police apprehended Appellant on the back porch. *Id.* at 84. Appellant was visibly sweaty and dropped a cellular telephone when police arrested him. *Id.* at 85. When later told he was to be charged with homicide and related offenses, Appellant claimed the victim came into his home and that he had the right to defend himself and his family. *Id.* at 113.

In a subsequent search of Appellant's residence, police recovered a damaged knife from the kitchen sink. *Id.* at 163. The tip of the knife's blade was missing. *Id.* Police also testified that they smelled the strong odor of bleach and found a bucket of bleach water on the floor in the kitchen. *Id.* at 32 and 105. From the second floor, police recovered a man's slipper and white towels that appeared to be stained with blood. *Id.* at 158-163. Police additionally observed and collected samples of drops of blood on the living room television, inside and outside of the exterior front door threshold, and from the front porch. *Id.* at 164-165. There were broken spindles and traces of blood on the railing around the front porch. *Id.* at 123. In addition, police observed a plastic outdoor chair with bloodstains overturned in the yard. *Id.* at 124.

Police also documented bloodstains on a wall leading to Locust Street where the victim was found. *Id.* at 127-129. The bloodstains were located approximately seven to eight feet from the ground, which police later described at trial as "cast off." *Id.*

In a subsequent autopsy, a forensic pathologist confirmed that the victim died as a result of 35 stab wounds to the face, neck, back, chest, arms, and hands. N.T., 10/17/2018, at 104-135. The pathologist recovered a knife tip lodged in the victim's cheekbone. *Id.* at 116. A microscopic comparison of that knife tip with the knife blade recovered from Appellant's sink revealed "one entity before being fractured." N.T., 10/16/2018, at 93. Subsequent testing revealed the presence of the victim's DNA on the recovered bloody slipper, a bloody white towel found in a second floor bathroom, the blood found on the living room television, as well as inside and outside the threshold to the front door. *Id.* at 62-83. There was no blood found on the knife recovered from the sink. *Id.* at 39.

A six-day jury trial commenced on October 15, 2018, wherein the Commonwealth presented the aforementioned evidence. Appellant testified in his own defense. In his [brief on direct appeal], he summarize[d] his testimony as follows:

> The defense asserted that [Appellant] suffers from Post-Traumatic Stress Disorder [(PTSD)] and had been the victim of sexual assaults as a minor. He testified that [the victim] entered his home without his permission, grabbed [Appellant's] groin, and attempted to sexually assault him. [Appellant] grabbed a knife to scare him, but [the victim] kept coming at him. Then [Appellant] said he blacked out or went into a rage and did not recall stabbing [the victim] but acknowledged doing so.
>
> . . .
>
> With respect to the events of the evening, Appellant testified that the decedent came through an unlocked door into his apartment [and] touched his thigh and [buttocks] without his permission. [Appellant] repeatedly asked the decedent to leave the residence, but he refused to do so, saying, "Pussy, I'm not leaving here until I get what I want." After saying

- 3 -

this, the decedent touched [Appellant's] groin and when [Appellant] tried to swat his hand away, [the victim] sprayed mace at [Appellant], while repeatedly saying, "I'm not leaving until I get what I want." A struggle ensued with the decedent touching [Appellant] in his "private area." When [Appellant] went to the kitchen, the decedent threw a chair at [Appellant], and in response, [Appellant] picked up a knife to scare the decedent, but it didn't work and [Appellant] kept trying to push him away. They continued to struggle when the decedent maced [Appellant] in the neck and chest, and a third time in the face. It was at this point that [Appellant] stabbed the decedent for the first time.

Eventually, they ended up outside, because [Appellant] wanted the decedent out of the house, but when [Appellant] attempted to get back into the apartment, the decedent pulled on [Appellant's] shirt and he fell to the bottom of the steps, where the decedent threw a chair at him. [Appellant] tried to ascend the stairs to get back into the apartment. At that point, the decedent was grabbing [Appellant] by his lower half and had hold of his groin, and [Appellant] blacked out, and stabbed the decedent to get him away from him. By this time, the two had fallen over the banister of [Appellant's] front porch, and the decedent got up and walked across the street and collapsed, with [Appellant] following to make sure he didn't get up and come back after him.

Brief of Appellant on Direct Appeal, at 9-10 (record citations omitted).

To rebut Appellant's defense, at trial, the Commonwealth also presented evidence of a secret romantic relationship between Appellant and the victim. The victim's mother testified that her son was openly gay. N.T., 10/15/2018, at 38. The victim often wore women's capris pants, lipstick, and women's perfume and he regularly carried a purse. *Id.* at 38-39. Police recovered two cellular telephones from the victim—one on the street in a pool of the victim's blood and the other from inside the victim's purse. N.T., 10/16/2018, at 122-123. The victim's mother confirmed one of the victim's cellular telephone numbers. N.T., 10/15/2018, at

38. As previously mentioned, police also recovered a cellular telephone that Appellant dropped on the back porch when he was apprehended. N.T., 10/16/2018, at 123. In an interview with police, Appellant confirmed his cellular telephone number. N.T., 10/17/2018, at 30-31. Police served search warrants on the cellular telephone service providers and obtained the records for all three cellular telephone numbers for the month prior to the stabbing. N.T., 10/16/2018, at 28-34. At trial, the Commonwealth presented evidence of specific text messages between Appellant and the victim. *Id.* at 47-55. During the month leading up to the incident, Appellant and the victim contacted each other 363 times. *Id.* at 44-45. The Commonwealth also presented records indicating that Appellant initiated lengthy, late-night conversations with the victim almost daily. N.T., 10/18/2018, at 58-60. The Commonwealth confronted Appellant with evidence of the internet browsing history from the cellular telephone associated with him, which showed searches for "shemale porn videos," "transvestite porn," "free gay porn," and "hermaphrodite porn." *Id.* at 80-82. Appellant denied conducting those internet searches and claimed that another roommate staying with him at the time had access to his cellular telephone. *Id.* at 67-68 and 80-82. Appellant, however, confirmed that audio call records showed that there were telephone calls from Appellant's cellular telephone to the victim immediately after the aforementioned internet searches. *Id.* at 80-82. Appellant denied having photographs depicting partially naked men stored on his cellular telephone. *Id.* at 68. Upon cross-examining Appellant, the Commonwealth presented evidence of a photograph of a man in a jock strap retrieved from the images section of Appellant's cellular telephone. N.T., 10/19/2018, at 72-73. Appellant claimed that he was unaware that the photograph was stored on his cellular telephone. *Id*.

Additionally, two experts testified at trial—Dr. Scott Scotilla and Dr. William Anthony Cox. Dr. Scotilla, an expert in forensic psychology, evaluated Appellant, diagnosed Appellant with Post-Traumatic Stress Disorder (PTSD), and testified about Appellant's history of physical and sexual abuse and neglect. N.T., 10/18/2018, at 147-218. Dr. Cox, a forensic pathologist and neuropathologist, testified regarding the toxicology report that was prepared as part of the victim's autopsy. N.T., 10/19/2018, at 34-60. The toxicology report indicated the presence of alcohol, Alprazolam (an antidepressant), Clonazepam (an anticonvulsant), amphetamines, methadone, cocaine, and tetrahydrocannabinol

(THC, a metabolite of marijuana) in the victim's blood. *Id*. Dr. Cox explained the general effects of each of these substances. *Id*. At the conclusion of trial, the jury convicted Appellant of the aforementioned crimes. On December 17, 2018, the trial court sentenced Appellant to life imprisonment without the possibility of parole for first-degree murder. The trial court imposed sentences of five to ten years of incarceration for aggravated assault,[3] one to two years of imprisonment for tampering with physical evidence, and one to two years of incarceration for obstruction of the administration of law. The trial court imposed these sentences consecutively to the sentence for first-degree murder and to each other. Appellant filed a timely post-sentence motion seeking a new trial and reconsideration of his sentence. The trial court denied relief by order entered on May 22, 2019. On June 3, 2019, the trial court issued an accompanying opinion for the reasons it denied relief.

*Commonwealth v. Williams*, 241 A.3d 1094, 1097–100 (Pa. Super. 2020).

On June 4, 2019, Appellant filed a notice of appeal. In his direct appeal, he raised various issues of trial court error, one of which challenged the trial court's ruling that limited the scope of testimony offered by defense experts Dr. Scotilla and Dr. Cox regarding the content of their respective written expert reports. On October 8, 2020, this Court rejected all appellate issues and affirmed judgment of sentence. Appellant filed no petition for allowance of appeal with the Pennsylvania Supreme Court.

On April 19, 2021, Appellant timely filed his first PCRA petition. Through court appointed counsel, he filed an amended petition asserting that his defense team ineffectively failed to ensure that each expert report contained the factual account upon which each doctor based his opinion. At the PCRA evidentiary hearing, trial counsel acknowledged that the trial court had issued a pretrial directive that an expert report must include the factual account of

the conflict upon which any expert opinion was based if the defense wished to present at trial expert testimony based upon either Appellant's or the victim's behavior during their encounter. N.T., 8/22/22, at 12, 14, 17. Trial counsel also confirmed that neither expert report submitted prior to trial contained such a factual report. N.T. at 18-22.

The trial court thus precluded the defense from eliciting expert testimony from clinical psychologist Dr. Scotilla that Appellant's violent conduct forming the basis for the charge of homicide was a manifestation of Post Traumatic Stress Disorder ("PTSD"), which produced a hypervigilant act of self-defense. In other words, he could not state directly that in his opinion Appellant acted in the heat of passion. N.T. at 22-23. Dr. Scotilla was permitted to testify, however, that a person diagnosed with PTSD placed in the scenario in which Appellant allegedly found himself would be far more vulnerable to an emotional overreaction than would a person without PTSD.

Similarly, the failure of expert toxicologist Dr. Cox to indicate in his written report that he based his opinion on Appellant's factual allegations precluded him from offering at trial the opinion that the victim would have exhibited aggressive behavior attributed to him by Appellant based on the toxicology report indicating significant levels of narcotics were present in the victim's blood at the time of his death. Dr. Cox, however, was permitted to testify that the victim's aggressive behaviors as alleged by Appellant could be consistent with what one could reasonably expect from a person with a toxicology screen like the victim's. N.T. at 24-25.

At the conclusion of the evidentiary hearing, the PCRA court denied Appellant's petition as meritless. This timely appeal followed.

Appellant's counseled brief presents the following questions for this Court's review:

1. Trial counsel provided ineffective assistance by failing to properly preserve Dr. Scott Scotilla's testimony through the submission of a complete expert report despite receiving pretrial notice that the report needed amended [sic] and this failure resulted in Mr. Williams being prohibited by the trial court from presenting his defense to the jury which denied him a fair trial.

2. Trial counsel provided ineffective assistance by failing to properly preserve Dr. William Anthony Cox's testimony through the submission of a complete expert report despite receiving pretrial notice that the report needed amended [sic] and this failure resulted in Mr. Williams being prohibited by the trial court from presenting his defense to the jury which denied him a fair trial.

3. Even if this Court holds the individual failures set forth above are insufficient to merit Mr. Williams' receipt of a new trial, the cumulative prejudice from being denied the opportunity to utilize the above expert testimony explaining what occurred on June 22, 2017 resulted in Mr. Williams being prohibited by the trial court from presenting his defense to the jury which denied him a fair trial.

Brief of Appellant, at 4.

"We review a ruling by the PCRA court to determine whether it is supported by the record and is free of legal error. Our standard of review of a PCRA court's legal conclusions is *de novo*." ***Commonwealth v. Cousar***, 154 A.3d 287, 296 (Pa. 2017) (citations omitted). However, we afford "great

deference" to the PCRA court's credibility determinations. *Commonwealth v. Flor*, 259 A.3d 891, 910-911 (Pa. 2021). As our Supreme Court has explained:

> We will not disturb the findings of the PCRA court if they are supported by the record, even where the record could support a contrary holding. [An appellate court's] scope of review is limited to the findings of the PCRA court and the evidence on the record of the PCRA court's hearing, viewed in the light most favorable to the prevailing party.

*Id.* (quotation marks and citations omitted).

To be eligible for relief under the PCRA, the petitioner must plead and prove by a preponderance of the evidence that his conviction or sentence resulted from "one or more" of the seven, specifically enumerated circumstances listed in 42 Pa.C.S.A. § 9543(a)(2). One of these statutorily enumerated circumstances is the "[i]neffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S.A. § 9543(a)(2)(ii).

Counsel is presumed to be effective and "the burden of demonstrating ineffectiveness rests on [A]ppellant." *Commonwealth v. Rivera*, 10 A.3d 1276, 1279 (Pa. Super. 2010). To satisfy this burden, Appellant must plead and prove by a preponderance of the evidence that:

> (1) his underlying claim is of arguable merit; (2) the particular course of conduct pursued by counsel did not have some reasonable basis designed to effectuate his interests; and, (3) but for counsel's ineffectiveness, there is a reasonable probability that

the outcome of the challenged proceedings would have been different.

***Commonwealth v. Fulton***, 830 A.2d 567, 572 (Pa. 2003). As this Court has explained:

> A claim has arguable merit where the factual averments, if accurate, could establish cause for relief. ***See Commonwealth v. Jones***, 876 A.2d 380, 385 (Pa. 2005) ("if a petitioner raises allegations, which, even if accepted as true, do not establish the underlying claim ..., he or she will have failed to establish the arguable merit prong related to the claim"). Whether the facts rise to the level of arguable merit is a legal determination.
>
> The test for deciding whether counsel had a reasonable basis for his action or inaction is whether no competent counsel would have chosen that action or inaction, or, the alternative, not chosen, offered a significantly greater potential chance of success. Counsel's decisions will be considered reasonable if they effectuated his client's interests. We do not employ a hindsight analysis in comparing trial counsel's actions with other efforts he may have taken.
>
> Prejudice is established if there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

***Commonwealth v. Stewart***, 84 A.3d 701, 707 (Pa. Super. 2013) (some quotations and citations omitted). "A failure to satisfy any prong of the test for ineffectiveness will require rejection of the claim." ***Id.***

In Appellant's first two issues, he contends that trial counsel ineffectively failed to heed the trial court's pretrial admonition to ensure that the defense expert reports of clinical psychologist Dr. Scotilla and toxicologist Dr. Cox, respectively, contained Appellant's factual account of the victim's alleged attack against him that purportedly triggered Appellant's hypervigilant self-

defense response. Because the expert reports failed to incorporate Appellant's factual account upon which Appellant's mental infirmity-based self-defense defense was based, the trial court granted the Commonwealth's motion to preclude defense expert testimony that Appellant's response was a manifestation of his PTSD and that the victim's act of aggression was a manifestation of his drug use as reflected in post-mortem toxicology blood test results.

At the PCRA evidentiary hearing, PCRA counsel admitted that Dr. Scotilla was allowed to testify Appellant suffers from PTSD and people who suffer from PTSD often overreact in emotional ways where people without PTSD would not react that way. N.T., 8/22/22, at 3-4. She conceded, however, that "what [Dr. Scotilla] was not permitted to testify to was that, based on his interview of the defendant and the defendant's recitation of what occurred on June 22nd of 2017, his – my client's behavior was consistent with someone who had PTSD." N.T. at 4.

Trial counsel testified that she believed the crux of the opinion rendered in Dr. Scotilla's expert report was nevertheless reflected in the doctor's trial testimony acknowledging that Appellant has PTSD and that a person with PTSD confronted with the same incursion described by Appellant would be far more vulnerable than a person without PTSD to counter with an emotionally driven "overreaction." N.T. at 55-57.

The trial record supports trial counsel's PCRA testimony. At trial, the court permitted Dr. Scotilla to testify that a person with a diagnosis of PTSD

stemming from a long history of sexual abuse victimization could be expected to overreact emotionally under the factual scenario offered by Appellant at trial:

> **DEFENSE COUNSEL:** I guess, finally, turning away from Mr. Williams and back to a person suffering from Post-Traumatic Stress Disorder, how would a person with Post-Traumatic Stress Disorder react to someone entering a home in the middle of the night, putting their hands on them while they were sleeping, grabbing at their genitals and refusing to leave when they were told to leave?
>
> **DR. SCOTILLA**: Especially if that harkens back to prior trauma, they could be much more vulnerable than you or I in the exact same situation to emotionally acting out or an over – an overreaction.

N.T. at 186. On redirect, Defense counsel was permitted to explore Appellant's proclivity towards overreaction as a mode of avoidance common among PTSD sufferers/patients:

> **DEFENSE COUNSEL:** Would the fact that he avoids – one of the characteristics of PTSD and that you found with an elevated scale with Mr. Williams was the avoidance. Would that impact whether he has sexual relations with male or female?
>
> **DR. SCOTILLA:** It could but it wouldn't necessarily impact it, no.
>
> **Q:** Would it change your opinion as far as how a person with PTSD would react to unwanted sexual advances?
>
> **A:** [After asking counsel to repeat the question] No.

**Q:** Those elevated scales[1] wouldn't change your opinion either?
**A:** As how one would react to unwanted sexual advances?

**Q:** Yes.

**A:** Not the scales of avoidance. It's – it's a different – that's a different thing. I can explain if you want.

. . .

[After explaining his work with survivors of Battered Women Syndrome, who would act as if they were instinctively drawn to abusive relationships but would seek relief from the specific abusive acts] What we're talking about in the avoidance piece of a PTSD diagnosis, the avoidance is avoiding a specific stimuli associated with the traumatic event [which] is different than saying they wouldn't actually avoid any relationships that smacked of anything that had to do with this trauma. It just doesn't work that way in the real word [sic]. They are different things when we are talking about avoidance and then we are talking about relationships.

N.T. at 206-08.

The trial court then permitted the Defense, over Commonwealth objection, to develop further the discussion initiated during cross-examination about reports filed during Appellant's childhood diagnosing him with ADHD

_____

[1] On cross-examination of Dr. Scotilla, the Commonwealth addressed Appellant's evaluation for posttraumatic stress and psychological sequelae of traumatic events under the Trauma Symptom Inventory-2 ("TSI-2") test, which placed Appellant on an "elevated scale" in several categories of inquiry, including: "Insecure Attachment-Relational Avoidance," indicating a preoccupation with and fears about rejection and abandonment in interpersonal relationships; "Defensive Avoidance", indicating a tendency to attempt to suppress painful thoughts or memories from awareness and attempt to avoid events or stimuli in their environment that might restimulate such thoughts and memories; and "Anger", indicating the patient often describes their angry thoughts and behaviors as intrusive, unwanted, and not entirely within their control. N.T., 10/18/18, at 192-94.

and Oppositional Defiant Disorder. N.T. at 208-209. On this point, Dr. Scotilla opined that Appellant's experience was representative of many childhood cases where the truly causative, underlying illness, PTSD, was not identified and diagnosed.

> **DR. SCOTILLA:** They are diagnosed with things like ODD and ADHD and sometimes they are just mistakenly labeled as being just bad kids and they are reacting to the trauma that they have lived through at home.
>
> **DEFENSE COUNSEL:** And that was consistent with what you found in your interview and your testing with Mr. Williams?
>
> **A:** That's correct.
>
> **Q:** And those old reports?
>
> **A:** Correct, especially the fact that in the 9[-]year[-]old ones you see very specific comments that are not talking about abuse history or you'll see the young 9[-] year[-]old Mr. Williams specifically deny abuse history with the stepfather along with him that later[,] in later reports we read that he was being abused in that very house. It's not until you get to 11[-]year[-]old, 13[-]year[-]old that you see professionals seeing it coming in about abuse, diagnosing PTSD consistently.

N.T. at 208-09.

The PCRA court agreed with defense counsel's assessment of the latitude afforded the defense during trial, and it thus concluded that Appellant failed to establish the prejudice prong of his ineffectiveness claim:

> While there may be arguable merit to Williams' claim that his attorneys should have sought an amended or supplemental record from Dr. Scotilla, the failure did not prohibit Williams from presenting his defense to the jury. To the contrary, Williams was able to present his heat of passion/voluntary manslaughter defense to the jury, but it failed because it was dependent on the credibility of Williams with respect to what happened that evening.

- 14 -

. . .

The trial court permitted Dr. Scotilla to testify about Williams' PTSD and how a person with PTSD would react to certain stimuli. However, the trial court precluded Dr. Scotilla from testifying that to a reasonable degree of psychological certainty this defendant is one who would meet the legal criteria of heat of passion in his reactions of stabbing his alleged attacker because [the doctor] did not include any factual basis for that opinion in his report.

Dr. Scotilla . . . testified about Williams' history of abuse [dating back to his childhood], including sexual abuse, and how that abuse caused Williams to suffer from Post Traumatic Stress Disorder (PTSD). He discussed his history of mental health issues and placements and how that supported the PTSD diagnosis. That history also showed that Williams was not making up a mental health problem just to create a defense in this case. Dr. Scotilla also talked about conducting testing on Williams and how that testing supported his conclusion that Williams suffered from PTSD, as well as other disorders.

. . .

[Defense Counsel] specifically asked Dr. Scotilla how a person suffering from PTSD would react to someone entering a home in the middle of the night, putting their hands on them while they are sleeping, grabbing their genitals and refusing to leave when they were told to leave. [ ] Dr. Scotilla answered, "Especially if that harkens back to prior trauma, they could be much more vulnerable than would you or I in the exact same situation to emotionally acting out or an over – an overreaction." [N.T. trial transcript, 10/18/18,] at 186-87.

In closing arguments, [Defense Counsel] argued that Williams acted in the heat of passion[] and that conclusion was supported by Dr. Scotilla's testimony. Trial Transcript, 10/22/2018, at 35-40. He noted how Williams had been sexually abused as a child and how sexual abuse affects people. He noted that Williams suffered from PTSD, how a situation or smell [similar to one from a past traumatic episode] can trigger the person with PTSD, and how the person will overreact as a result of the PTSD. He argued that situation and the overkill of the stabbing incident showed provocation and heat of passion.

- 15 -

The heat of passion/voluntary manslaughter defense was presented to the jury; the jury just didn't buy it because it was dependent on Williams' statements and testimony about his relationship with the victim and what happened that night, which was not consistent and not credible.

Dr. Scotilla acknowledged at trial that his conclusions to some extent were dependent on Williams' honesty. Trial Transcript, 10/18/18, at 189-90.

In [the Commonwealth's] closing arguments, the prosecutor extensively and persuasively argued Williams' lack of credibility [with particular emphasis] on his denial of being in a sexual relationship with the victim based on the number and length of phone calls and the content and number of text messages between them. He also note[d] how Williams' version of what happened [was] inconsistent with physical evidence and the testimony of disinterested witnesses. Trial Transcript, 10/22/18, at 81, 87-89, 92-95, 98, 100-122.

. . .

Dr. Scotilla was able to testify about PTSD and heat of passion. [The Defense] was not able to present the final statement of Scotilla, but it was argued to the jury.

PCRA Opinion, 11/29/23, at 11-14.

Furthermore, on the importance of Appellant's credibility at trial, the PCRA court observed that evidence introduced at the PCRA hearing showed significant discrepancies between Appellant's trial testimony and his statement to police on the night of his arrest, the many times Appellant changed his story on the events of the evening causing defense counsel to doubt his trial testimony, and the contradictions between Appellant's trial testimony about his childhood experiences and what he told Dr. Scotilla about those experiences. PCRA Opinion at 15. Accordingly, the PCRA court

concluded that Appellant was not prejudiced from the limitations placed on Dr. Scotilla's expert testimony. Instead, it reasoned, "[h]is trial attorneys presented a heat of passion/voluntary manslaughter defense, but the jury did not accept them due to Williams' lack of credibility." **Id**.

We discern no error with the PCRA court's determination. Here, despite the pretrial ruling, the defense was able to present to the jury Appellant's alleged factual scenario that an uninvited, menacing acquaintance unlawfully entered Appellant's home and bedroom at night as Appellant slept and attempted to force himself sexually on Appellant. Doctor Scotilla, moreover, told the jury that, compared to a person without PTSD, a person with PTSD could be prone to an emotionally driven "overreaction" to such an incursion. As it is reasonable to conclude that even one without PTSD would employ a vigilant physical defense of person and home under this scenario, it follows that an "overreaction" by comparison could entail significant violence.

Taken as a whole, therefore, Dr. Scotilla's testimony conveyed to the jury that a person with PTSD, like Appellant, placed in Appellant's alleged scenario could be far more prone to offer a hypervigilant, excessively violent response than would one without PTSD. As such, though Dr. Scotilla could not, by pretrial ruling, state directly that Appellant's conduct manifested PTSD consistent with a heat of passion defense, the inference drawn from his collective testimony is clear; if one finds Appellant's factual allegations regarding the victim's incursion credible, then Appellant's response could be understood as a hypervigilant act of self-defense manifesting PTSD.

- 17 -

As such, the doctor's proffer, taken in its entirety, all but provided the functional equivalent of the direct expert testimony Appellant denied him through the alleged ineffective assistance of trial counsel. Accordingly, we conclude that the prejudice, if any, incurred from the loss of such direct testimony was *de minimis* and, thus, insufficient to satisfy Appellant's burden to prove that but for counsel's challenged conduct he would have obtained a better result at trial.

Turning to the limitations placed on Dr. Cox's expert testimony with respect to the victim's post-mortem toxicology report, we have noted *supra* that the PCRA court determined Appellant failed to prove any prong of the three-pronged ineffective assistance of counsel claim. Because Dr. Cox admitted at trial that one could not determine from a toxicology report a person's corresponding behavior without also knowing that person's drug use history, he could not opine to a reasonable degree of medical certainty that the victim was hyperactive and aggressive as Appellant alleged.

From the values obtained in the toxicology screening alone, Dr. Cox explained at trial that he could not tell if the victim would have been unconscious or in an aggressive state. N.T., 10/19/18, at 58-59. Either manifestation could have taken place given the test results. As such, the trial court ruled that the most Dr. Cox was permitted to testify was that any bizarre, aggressive, and threatening behaviors that Appellant attributed to the victim during their interaction could be consistent with the levels of substances found in the victim's system post-mortem. N.T., 10/19/18, at 50, 53-54, 57.

The PCRA court found that the defense team was unable to provide additional information to Dr. Cox regarding the victim's use history because they did not have that information and the victim was deceased. The PCRA court noted, further, that Appellant did not testify at either his trial or PCRA hearing as to the victim's drug use history. Therefore, the PCRA court determined that Appellant's ineffectiveness claim failed under each prong of the ineffectiveness inquiry. After careful review of the record, we concur with the PCRA court's reasoning that Appellant demonstrated no arguable merit to his claim of ineffective assistance of trial counsel pertaining to their presentation of Dr. Cox's testimony, and that the jury's finding of fact with respect to the victim's conduct was largely dependent upon its assessment of Appellant's credibility as a witness.

Finally, because we base our denial of Appellant's second ineffective assistance of counsel claim on its lack of arguable merit, Appellant may not prevail on his claim of cumulative prejudice. *See Commonwealth v. Hutchinson*, 25 A.3d 277 (Pa. 2011) (quoting *Commonwealth v. Wright*, 961 A.2d 119, 158 (Pa. 2008)) (holding a claimant may not prevail on a cumulative prejudicial effect claim without having demonstrated a particular cumulation).

For the foregoing reasons, we affirm the PCRA order entered below.

Order affirmed.


Judgment Entered.


Benjamin D. Kohler, Esq.
Prothonotary


Date: 4/22/2024