J-S34029-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| WILLIAM ARTHUR CAVANAUGH, SR. | : | |
| | : | |
| Appellant | : | No. 128 WDA 2024 |

Appeal from the PCRA Order Entered January 2, 2024
In the Court of Common Pleas of Bedford County Criminal Division at
No(s): CP-05-CR-0000016-2018

BEFORE:    DUBOW, J., LANE, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY LANE, J.:                    **FILED: JANUARY 13, 2025**

William Arthur Cavanaugh, Sr. ("Cavanaugh"), appeals from the order dismissing his first petition for relief filed pursuant to the Post Conviction Relief Act ("PCRA").[1]  We affirm.

Cavanaugh has six biological children.  In 2017, the Commonwealth charged him with numerous sexual offenses, committed between 2012 and 2014 against his two youngest children — his daughter, J.R. ("J.R."), and son, M.M. ("M.M.").

This matter proceeded to a jury trial in December 2019.  Michael Filia, Esquire ("Trial Counsel"), represented Cavanaugh.  J.R. testified that from the time she was in seventh grade to ninth grade, Cavanaugh sexually abused her

_____

[*] Former Justice specially assigned to the Superior Court.

[1] **See** 42 Pa.C.S.A. §§ 9541-9546.

multiple times a week. *See* N.T. Jury Trial Day I, 12/11/19, at 116-22. M.M., who is approximately two years younger than J.R., testified that Cavanaugh sexually abused him from the time he was ten or eleven years old until he was in seventh grade.[2] *See id*. at 175, 181, 185. We note Cavanaugh was a truck driver, and M.M. testified that in eighth grade, after the abuse stopped, he rode on a truck with Cavanaugh for one month. *See id*. at 186.

The trial court admitted, over Cavanaugh's objection, evidence that in 2007, he abused his then twenty-year old daughter, D.G. ("D.G."), who, as a result, gave birth to his child.[3] D.G. testified the ongoing "sexual abuse" occurred in their home, and she was "uncomfortable" and "didn't like it." *Id*. at 49-51. The Commonwealth presented DNA evidence, which Cavanaugh did not dispute, that he was the father of D.G.'s child. *See* N.T. Jury Trial Day II, 12/12/19, at 29, 43. D.G. revealed that she was charged with incest, but that charge was withdrawn. Cavanaugh was also charged with incest, but this charge was not disclosed to the jury.[4] *See* N.T., 12/11/19, at 70, 72. Cavanaugh was *not* charged with rape of D.G.

---

[2] M.M. could not remember what grade he was in when the abuse started. *See* N.T., 12/11/19, at 181, 204.

[3] As discussed *infra*, Cavanaugh denies that he abused D.G. Nevertheless, we summarize the trial testimony given by D.G.: she agreed with the prosecutor's description of Cavanaugh's conduct as "sexual abuse." N.T., 12/11/19, at 50.

[4] The record does not indicate the outcome of Cavanaugh's incest charge.

Cavanaugh testified in his own defense and denied J.R.'s and M.M.'s allegations. *See* N.T., 12/12/19, at 178, 188. When asked on cross-examination about whether he had sexual intercourse with D.G. and fathered her child, Cavanaugh initially responded: "There's only been one birth that I know of and it didn't happen with that kind of way. And that was the miracle of Jesus Christ. [*sic*]" *Id*. at 198. Upon further questioning, however, Cavanaugh's account was that: (1) while he was asleep, D.G. unzipped his pants, "climbed on top of [him], and started having sex with" him; and (2) D.G. had "propositioned [him] several times for sex." *Id*. at 199-201. Cavanaugh acknowledged that in 2009, he made these same statements to a trooper in an interview. However, Cavanaugh denied the truth of another statement he made to the trooper — that at the time of the sexual encounter with D.G., "he was dreaming about having sex with his wife." *Id*. at 200.

The jury found Cavanaugh guilty of all nineteen crimes charged: (1) rape of child; (2) six counts of involuntary deviate sexual intercourse ("IDSI") with a person less than sixteen years of age; (3) IDSI with a child; (4) two counts of corruption of minors; (5) two counts of indecent assault of a complainant less than thirteen years of age; and (6) and seven counts of indecent assault of a complainant less than sixteen years of age.[5]

---

[5] 18 Pa.C.S.A. §§ 3121(c), 3123(a)(7), (b), 6301(a)(1)(ii), 3126(a)(7), (8).

On June 3, 2020, the trial court imposed an aggregate sentence of seventy to 140 years' imprisonment, to be followed by three years' probation. The trial court found Cavanaugh was a sexually violent predator, as well as a Tier III offender, under the Pennsylvania Sexual Offender Registration and Notification Act.[6]

Cavanaugh filed a direct appeal, and this Court affirmed his judgment of sentence. *See Commonwealth v. Cavanaugh*, 266 A.3d 628 (Pa. Super. 2021) (unpublished memorandum). Cavanaugh attempted to file a *pro se* petition for allowance of appeal, and the Pennsylvania Supreme Court provided an extension of time to submit the proper filings. However, the Supreme Court administratively closed his matter on March 29, 2022. *See Commonwealth v. Cavanaugh*, 80 WT 2021 (Pa. 2022) (order).

On October 17, 2022, Cavanaugh filed a timely, *pro se* PCRA petition. The PCRA court, who had presided over trial, appointed present counsel, Grant Shonesky, Esquire ("PCRA Counsel"). Cavanaugh filed an amended, counseled PCRA petition, which averred Trial Counsel was ineffective for: (1) not advising him that he could call character witnesses at trial; (2) not adequately preparing for trial; (3) not effectively cross-examining M.M.; and (4) not objecting to a statement in the Commonwealth's closing argument —

---

[6] 42 Pa.C.S.A. §§ 9799.10 to 9799.75. Cavanaugh is subject to lifetime reporting.

that Cavanaugh "raped" D.G. Amended Post Conviction Relief Act Petition, 5/15/23, at 9-31.

The PCRA court conducted an evidentiary hearing, at which Cavanaugh, his ex-wife, D.C. ("D.C."), and son, A.C. ("A.C."), testified.[7] The Commonwealth pointed out that Cavanaugh failed to call Trial Counsel to testify. *See* N.T., 7/21/23, at 109. PCRA Counsel responded he believed that Trial Counsel was not "willing to assist" or testify, because: Trial Counsel did not initially respond to his phone call or email; when subsequently reached on his cell phone, Trial Counsel stated "he would be happy to" provide his file on Cavanaugh's case, but did not provide it; and sometime thereafter, Trial Counsel saw PCRA Counsel at the courthouse and again offered to provide the file, but did not. *Id*. at 109-10. PCRA Counsel conceded, however, that he could have served a subpoena on Trial Counsel to appear.

On January 2, 2024, the PCRA court entered the underlying order denying Cavanaugh's PCRA petition. Generally, the court found Cavanaugh failed to establish prejudice with respect to any of his claims. Cavanaugh filed a timely notice of appeal. Both he and the PCRA court have complied with Pa.R.A.P. 1925.

---

[7] D.C. is also J.R., M.M., and A.C.'s mother, although she is not D.G.'s biological mother. At trial, D.C. and Cavanaugh were still married, and she testified she did not see any inappropriate interaction between Cavanaugh and the children. *See* N.T., 12/12/19, at 61, 70. Similarly, Cavanaugh's son, A.C., testified that he did not observe, and his siblings did not tell him about, anything inappropriate between his father and siblings. *See id*. at 106.

Cavanaugh raises the following issues for our review:

1. Whether the PCRA court erred by denying [Cavanaugh's] claim of ineffective assistance of Trial Counsel, where Trial Counsel failed to inform [Cavanaugh] of his ability to call character witnesses in his defense at trial, and where Trial Counsel admitted, on the record at trial, that he did not discuss with [Cavanaugh] the possibility of calling character witnesses at trial?

2. Whether the PCRA court erred by denying [Cavanaugh's] claim of ineffective assistance of Trial Counsel, where Trial Counsel failed to interview and call available witnesses at trial, despite [Cavanaugh] having provided Trial Counsel with the names and contact information of said witnesses?

3. Whether the PCRA court erred by denying [Cavanaugh's] claim of ineffective assistance of Trial Counsel, where Trial Counsel failed to adequately prepare the case for trial, which prejudiced [Cavanaugh]?

4. Whether the PCRA court erred by denying [Cavanaugh's] claim of ineffective assistance of counsel for Trial Counsel's failure to effectively cross-examine the Commonwealth's witnesses, despite the existence of testimony that any reasonable attorney would have used to impeach the Commonwealth's witnesses?

5. Whether the PCRA court erred by denying [Cavanaugh's] claim of ineffective assistance of Trial Counsel, where Trial Counsel failed to object to the use of the word "rape" in the Commonwealth's closing argument, which was an inaccurate characterization of [D.G.'s] testimony that likely encouraged the jury to convict [Cavanaugh] based upon prohibited propensity evidence?

Cavanaugh's Brief at 4-5 (unnecessary capitalization omitted).

In his first issue, Cavanaugh avers the PCRA court erred in denying relief on his claim that Trial Counsel was ineffective for not informing him that he

could call character witnesses at trial. We set forth the applicable standard of review and general principles governing a claim of ineffective assistance:

> Our standard of review from the denial of a PCRA petition "is limited to examining whether the PCRA court's determination is supported by the evidence of record and whether it is free of legal error." "The PCRA court's credibility determinations, when supported by the record, are binding on this Court; however, we apply a *de novo* standard of review to the PCRA court's legal conclusions."
>
> We presume that the petitioner's counsel was effective. To establish a claim of ineffective assistance of counsel, a defendant "must show, by a preponderance of the evidence, ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place."
>
> The burden is on the defendant to prove all three of the following prongs: "(1) the underlying claim is of arguable merit; (2) that counsel had no reasonable strategic basis for his or her action or inaction; and (3) but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different." Moreover, "[a] failure to satisfy any prong of the ineffectiveness test requires rejection of the claim of ineffectiveness."

***Commonwealth v. Campbell***, 260 A.3d 272, 277-78 (Pa. Super. 2021) (citations omitted).

> To establish "actual prejudice," the petitioner must show:
>
> [a] reasonable probability that, but for counsel's lapse, the result of the proceeding would have been different. In making this determination, a court . . . must consider the totality of the evidence before the judge or jury. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Ultimately, a reviewing court must question the reliability of the proceedings and ask whether the result of the particular proceeding was unreliable because of a breakdown in

the adversarial process that our system counts on to produce just results.

***Id***. at 278 (citation omitted).

This Court has stated:

"[A] lawyer should not be held ineffective without first having an opportunity to address the accusation in some fashion." In fact, our Supreme Court has cautioned against finding no reasonable basis for trial counsel's actions in the absence of supporting evidence. "The fact that an appellate court, reviewing a cold trial record, cannot prognosticate a reasonable basis for a particular failure to raise a plausible objection does not necessarily prove that an objectively reasonable basis was lacking."

***Commonwealth v. Reyes-Rodriguez***, 111 A.3d 775, 783-84 (Pa. Super. 2015) (citations and footnote omitted).

With respect to character witnesses, this Court has explained:

The admission of character evidence is controlled by Pa.R.E. 404 and 405. According to Pa.R.E. 404(a)(2)(A), "a defendant may offer evidence of the defendant's pertinent trait[.]" . . .

> Evidence of good character offered by a defendant in a criminal prosecution must be limited to his general reputation for the particular trait or traits of character involved in the commission of the crime charged. Such evidence must relate to a period at or about the time the offense was committed and must be established by testimony of witnesses as to the community opinion of the individual in question, not through specific acts or mere rumor.

***Commonwealth v. Medina***, 209 A.3d 992, 997 (Pa. Super. 2019) (citations omitted).

Additionally, we consider:

A defense counsel's failure to call a particular witness to testify does not constitute ineffectiveness *per se*. "In establishing

whether defense counsel was ineffective . . . , a defendant must prove the witnesses existed, the witnesses were ready and willing to testify, and the absence of the witnesses' testimony prejudiced petitioner and denied him a fair trial."

***Commonwealth v. Johnson***, 27 A.3d 244, 247 (Pa. Super. 2011) (citations omitted).

By way of background, we first summarize that at trial, the trial court asked Trial Counsel whether he discussed with Cavanaugh the possibility of character witnesses. ***See*** N.T., 12/12/19, at 141. Trial Counsel responded that he did not. The trial court then advised Cavanaugh that he could call witnesses to testify about his reputation in the community. Cavanaugh stated he knew three people in California who could testify they were with him and M.M. "just prior to" the instant charges, but he could not identify character witnesses "[o]ff the top of [his] head." ***Id***. at 143-44.

At the PCRA hearing, Cavanaugh testified about potential character witnesses named in his PCRA petition: his best friend of fifty years, Johnnie Trawick — who had passed away since trial — and his wife, Brenda Trawick (collectively, "the Trawicks"); and his brother's wife, Suzie Moore ("Moore"). Cavanaugh testified to the following: (1) these individuals lived in California but had observed him with his children when he was there as a part of his truck driving; (2) Cavanaugh previously cared for their kids; (3) in July 2017, just before the underlying allegations arose, he and M.M. stayed at their houses for several days; and (4) they would have testified they "never [saw him] do anything inappropriate with kids." N.T., 7/21/23, at 24-25, 28, 49.

The Trawicks and Moore knew of Cavanaugh's charge of incest against D.G.,
but "they still thought [he was] a good guy." *Id*. at 51. Cavanaugh informed
Trial Counsel of these witnesses "[m]any times." *Id*. at 26. Cavanaugh
conceded, however, that as character witnesses, these individuals could not
have testified about whether they saw him do anything inappropriate with
children. *See id*. at 56-57.

At the PCRA hearing, Cavanaugh also identified individuals for the first
time as potential character witnesses: Charles and Brenda Burkett
(collectively, "the Burketts") and Jerry Frankenberry ("Frankenberry"), whom
Cavanaugh knew from church; Edie Shepard ("Shepard"), the wife of the
bishop of his church; and Kevin Chaney ("Chaney"), a retired state trooper,
whose wedding Cavanaugh had worked as a deejay. Cavanaugh "believe[d]"
that at the time of trial, they would have testified as to his reputation for being
law abiding, peaceful, truthful, and trustworthy. N.T., 7/21/23, at 64.
However, Cavanaugh did not know for sure that they would have testified on
his behalf. *See id*. at 64-65. Following trial, Cavanaugh was no longer on
good terms with the Burketts, Shepard, or Moore. *See id*. at 52, 64-65.

On appeal, Cavanaugh asserts the PCRA court erred in denying relief on
his claim that Trial Counsel was ineffective for failing to advise him that he
could call character witnesses, and to investigate potential character
witnesses. First, Cavanaugh emphasizes there was no DNA evidence for, nor
eyewitness to, the alleged offenses against J.R. and M.M., and thus "the

central issue" for the jury was the weight of their credibility against his. Cavanaugh's Brief at 21. Cavanaugh asserts his underlying issue had arguable merit, as "evidence of [his] character was absolutely critical to the [jury's] determination of credibility and . . . could have created reasonable doubt." *Id*. at 28. Second, Cavanaugh asserts Trial Counsel had no reasonable basis for not investigating or presenting character witnesses. Cavanaugh acknowledges that he did not call Trial Counsel to testify at the PCRA hearing, but maintains that the trial transcript "makes clear that Trial Counsel's overall strategy was to . . . show that the alleged victims, J.R. and M.M., were lying." *Id*. Finally, Cavanaugh contends that he was prejudiced by Trial Counsel's actions, where: his proffered character witnesses "likely would have testified on [his] behalf at trial had they been contacted by Trial Counsel;" and, again, there was no DNA or other physical evidence of the abuse, and the issue at trial was credibility. *Id*. at 30, 32.

In considering Cavanaugh's claim, the PCRA court voiced doubt at the PCRA hearing that he established prejudice or shown the outcome of his trial would have been different. *See* N.T., 7/21/23, at 98. The court pointed out that Cavanaugh could not "even say" that the local witnesses, the Burketts, Frankenberry, Shepard, or Chaney, would have been available to testify, nor what they would have testified to. *Id*. at 99. With respect to the California witnesses, the PCRA court reasoned that they spent, at most, two to three

days a month with Cavanaugh and did not observe him interact with others, and thus would not have been effective character witnesses. *See id*. at 101.

In its opinion, the PCRA court reiterated that even if the Burketts and Shepard were willing to testify, Cavanaugh failed to articulate what their trial testimony would have been, or how their testimony would have benefited his case. *See* PCRA Court Opinion, 4/23/24, at 4. The court found that at most, Cavanaugh "generally asserted that these witnesses would say he was of good character." *Id*. at 5. The PCRA court further noted that Cavanaugh failed to call Trial Counsel, or any other proffered character witness, to testify. Finally, the court pointed out that he was initially "unable to even recall Kevin Chaney's last name," and overall found Cavanaugh's credibility at the PCRA hearing was "poor." *Id*.

Based on our review, we determine the record supports the PCRA court's rulings, as well as its credibility determination. *See Campbell*, 260 A.3d at 277. First, Cavanaugh does not dispute the PCRA court's finding — nor his own testimony — that he could not say for sure that the local witnesses would have testified on his behalf at trial. We thus conclude Cavanaugh has not shown his underlying issue with respect to these witnesses has merit, and the PCRA court did not err in denying relief. *See Campbell*, 260 A.3d at 277-78.

With respect to the proposed California witnesses, we reiterate that evidence of a defendant's character "must be established by testimony . . . as to the **community** opinion of the individual in question, not through specific

- 12 -

acts or mere rumor." *Medina*, 209 A.3d at 997 (emphasis added). At the PCRA hearing, while Cavanaugh initially stated that the California witnesses would have testified that they "never [saw him] do anything inappropriate with kids," he later conceded such testimony would have been prohibited. *See* N.T., 7/21/23, at 49, 57. Additionally, while Cavanaugh averred that he had "a presence in the [California] community," established by his going out with his friends to eat dinner, gamble at casinos, and visit his parents' gravesites, Cavanaugh could not name any of the people they would have interacted with, such as waitresses or casino employees. *Id*. at 57, 61-62. Accordingly, Cavanaugh did not establish that these individuals in California would have been able to testify as to the local California community's opinion of his reputation. *See Medina*, 209 A.3d at 997.

Finally, we agree with the PCRA court that Cavanaugh failed to call Trial Counsel to testify at the PCRA hearing, or present any evidence as to what Trial Counsel would have stated about his representation. PCRA Counsel acknowledged that he could have subpoenaed him. *See* N.T., 7/21/23, at 110. We reject Cavanaugh's bald claim that we may infer that Trial Counsel lacked a reasonable basis for his actions. *See Reyes-Rodriguez*, 111 A.3d at 783-84. In light of all the foregoing, we similarly conclude that Cavanaugh has not established his underlying issue has merit, or that Trial Counsel lacked a reasonable basis for his actions. *See Campbell*, 260 A.3d at 277-78. We thus conclude no relief is due on Cavanaugh's first issue.

In his second issue, Cavanaugh avers the PCRA court erred in denying relief on his claim that Trial Counsel was ineffective for not calling his best friend and his wife, the Trawicks, and his sister-in-law, Moore, as both fact and character witnesses. Cavanaugh maintains that: (1) he "helped . . . raise" and babysat the Trawicks' children; (2) he lived with his brother and Moore and babysat their children; (3) he and M.M. were at the Trawicks' and Moore's homes "in California, for several days in 2017, just prior to [Cavanaugh's] being charged with" the instant crimes; and (4) these witnesses would have testified that they observed and "knew the relationship that [Cavanaugh] had with his children." Cavanaugh's Brief at 36-37. Cavanaugh concedes that "hypothetically," Trial Counsel may have had a strategic basis for not calling these witnesses at trial, but Cavanaugh insists there was no reasonable basis not to contact them at all. *Id*. at 40. Cavanaugh also claims he was prejudiced because, again, "the only issue [at trial] was [his] credibility . . . versus that of" J.R. and M.M, and his proposed witnesses' testimony might have cast "a shadow upon the alleged victims' truthfulness." *Id*. at 41.

Based on our review, we determine the record supports the PCRA court's denial of relief. *See Campbell*, 260 A.3d at 277. We have addressed Cavanaugh's claims regarding character witnesses above, and determined they are meritless. Furthermore, we reiterate that at the PCRA hearing, Cavanaugh conceded that he could not have called the Trawicks and Moore to testify, as fact witnesses, about specific acts. *See* N.T., 7/21/23, at 56-57.

Thus, he has waived any claim that Trial Counsel should have called these witnesses to testify about their observations of him and his son, M.M.[8] ***See*** Pa.R.A.P. 302(a) (stating that "[i]ssues not raised in the trial court are waived and cannot be raised for the first time on appeal"). Thus, no relief is due on Cavanaugh's second issue.

In his third issue, Cavanaugh avers the PCRA court erred in denying relief on his claim that Trial Counsel was ineffective for not adequately preparing for trial. This Court has explained:

> "[C]ounsel is not deemed ineffective *per se* merely because of the short amount of time he has met with his client." "[T]he time actually spent by counsel with the accused discussing his case is not necessarily related to, and affords no basis for inferring, the extent of total trial preparation." Rather, "to establish [ineffectiveness of counsel, a petitioner] must establish that counsel inexcusably failed to raise issues which, had they been raised, would have afforded . . . relief."

***Commonwealth v. Watley***, 153 A.3d 1034, 1046 (Pa. Super. 2016) (citations omitted).

On appeal, Cavanaugh presents the following arguments. First, over the first eleven months of his representation, Trial Counsel met with

---

[8] In any event, the PCRA court found that the proffered testimony — that the California witnesses observed Cavanaugh care for children in California and saw him with M.M. around the time of the underlying allegations — would have been irrelevant and thus inadmissible at trial. ***See*** PCRA Court Opinion, 4/23/24, at 6. The court reasoned that: (1) neither victim in this case, J.R. or M.M., testified that sexual abuse occurred in California; and (2) Johnnie Trawick would not have been qualified to testify about M.M.'s "'disposition' at any time during, prior to, or after" the abuse. ***Id***. The PCRA court thus concluded Cavanaugh failed to establish prejudice.

- 15 -

Cavanaugh only at status conferences at court, where there was not enough time to discuss the case. Subsequently, Trial Counsel did visit Cavanaugh twice at the jail, but tried "to talk [him] into taking a deal instead of talking about the case itself." Cavanaugh's Brief at 44. Second, Cavanaugh's ex-wife, D.C., and son, A.C. both testified at the PCRA hearing that Trial Counsel did not contact or consult with them, attempt to understand the "family dynamics," or visit their house, where the alleged abuse occurred. *Id*. at 44-45, 52. Third, D.C. provided Trial Counsel with D.G.'s medical records and informed him that D.G. "had a history of being suicidal and [was] bipolar." *Id*. at 45. Trial Counsel could have, but failed to, discredited D.G. "by using her medical records to show that [she] was not of a sound mind and could not be trusted to tell the truth." *Id*. at 45.

In denying relief, the PCRA court found there was no merit to Cavanaugh's claims concerning D.G.'s medical records. At the PCRA hearing, the PCRA court pointed out that at trial, D.G. testified that she previously felt "suicidal." N.T., 7/21/23, at 102. The court asked what additional evidence would have affected the outcome of trial. PCRA Counsel responded that Trial Counsel could have "hire[d] an expert witness [to] testify to what effects . . . certain conditions have on someone's ability to tell the truth or . . . make an accurate . . . recollection of an event." *Id*. at 102-03. In support, PCRA Counsel argued the jury may have "put a little too much weight into" the prior bad acts-evidence — that if Cavanaugh "had sex with his own daughter[, the

jury may have been] inclined to believe" he also committed the offenses against J.R. and M.M. *Id*. at 103. The PCRA court responded that on this point, they could not "ignore" the "extremely poor" quality of Cavanaugh's own trial testimony: that while he was asleep, D.G. unzipped his pants "and started having sex with" him, all "during a dream sequence" in which he thought he was having sex with his wife. *Id*. at 103-04.

In its opinion, the PCRA court further found the following. In light of the DNA evidence, it was "undeniable that [D.G.'s] testimony was truthful that [Cavanaugh] had sexual intercourse with her." PCRA Court Opinion, 4/23/24, at 6. Additionally, given Cavanaugh's own admission at trial, that he had sexual intercourse with D.G., Trial Counsel was not ineffective "for choosing not to cross-examine [D.G.] on any mental health diagnosis." *Id*. at 7.

Based on our review, we determine the record supports the PCRA court's denial of relief. *See Campbell*, 260 A.3d at 277-78. First, although Cavanaugh claims that Trial Counsel failed to adequately meet with him or meet at all with his family, Cavanaugh does not identify what additional, relevant information could have obtained. Cavanaugh vaguely refers to "family dynamics" and the family home as the site of the abuse, but fails to explain what issues, based on this alleged information, Trial Counsel could have raised. *See Watley*, 153 A.3d at 1046; *see also Campbell*, 260 A.3d at 277-78. Additionally, in the absence of any testimony from Trial Counsel, we cannot conclude that Cavanaugh established that he lacked a reasonable

basis for his actions. **See Watley**, 153 A.3d at 1046. Accordingly, we agree that no relief was due on Cavanaugh's claim that Trial Counsel failed to adequately meet with him or consult with D.C. or A.C.

Second, as the PCRA court pointed out, Cavanaugh's argument — that evidence of D.G.'s mental health records would have cast doubt on her testimony — went to her credibility and the weight of her testimony. It is well established that at trial, "the finder of fact[,] while passing upon the credibility of witnesses and the weight of the evidence produced is free to believe all, part or none of the evidence." **Commonwealth v. Talbert**, 129 A.3d 536, 543 (Pa. Super. 2015). On appeal, Cavanaugh does not address the PCRA court's discussion that his own trial testimony "was extremely poor in quality." **See** N.T., 7/21/23, at 104. Additionally, the jury did hear testimony — from D.G. herself — that she previously "was feeling suicidal." N.T., 12/11/19, at 60. Finally, although PCRA Counsel argued that Trial Counsel should have presented expert testimony as to the effect suicidal feelings or bipolar disorder could have on a person's ability to tell the truth or recall events, PCRA Counsel himself did not present such evidence at the PCRA hearing in support of Cavanaugh's claim.[9] **See** N.T., 7/21/23, at 102.

---

[9] Additionally, we note that at the PCRA hearing, the Commonwealth argued D.G.'s mental health records would have been inadmissible under the Mental Health Procedures Act. **See** N.T., 7/21/23, at 79; **see also** 50 P.S. §§ 7101-7503. Cavanaugh did not respond to this argument.

Under the totality of the trial evidence — including J.R.' and M.M.'s extensive testimony about the abuse — we conclude that Cavanaugh has not shown that, but for Trial Counsel's alleged error, there was a reasonable probability the outcome of his trial would have been different. ***See Campbell***, 260 A.3d at 278. On the particular circumstances presented, we conclude that Cavanaugh's trial was not "unreliable because of a breakdown in the adversarial process." ***Id***. Thus, Cavanaugh's third issue merits no relief.

In his fourth issue, Cavanaugh avers the PCRA court erred in denying relief on his claim that Trial Counsel was ineffective for not effectively cross-examining the victim, M.M. As stated above, to establish the ineffective assistance of counsel, a petitioner must show: "(1) the underlying claim is of arguable merit; (2) that counsel had no reasonable strategic basis for his or her action or inaction; and (3) but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different." ***Campbell***, 260 A.3d at 277-78.

Cavanaugh reiterates that at trial, M.M. testified that Cavanaugh last abused him in seventh grade, but in eighth grade, M.M. "went on [Cavanaugh's] truck with [him] for a month." Cavanaugh's Brief at 56 (*citing* N.T., 12/11/19, at 185-86). Cavanaugh reasons "that it is purely illogical that a victim of repeated sexual abuse" would "voluntarily go on a truck, for a month straight, alone with the person whom he alleges had . . . abused him for years." ***Id***. at 56-57. Cavanaugh thus maintains M.M.'s testimony was

"fertile grounds for cross-examination and provided a significant opportunity for Trial Counsel to discredit M.M.'s allegations." *Id*. at 56.  Contrary to the PCRA court's finding, Cavanaugh insists he was prejudiced, as "the dispositive issue at trial was [his] credibility [versus that] of the alleged victims," and proper cross-examination "would have directly undermined M.M.'s credibility." *Id*. at 57-58.

In denying relief, the PCRA court found Cavanaugh failed to establish a reasonable probability that such cross-examination would have affected the outcome of the proceedings.  *See* PCRA Court Opinion, 4/23/24, at 7.  The court reasoned: (1) "both victims testified at length regarding [Cavanaugh's] sexual assaults;" (2) Trial Counsel did cross-examine "both victims on the particular dates, places, and circumstances of" the alleged abuse; (3) Cavanaugh's "claim ignores the fact that a child may still have an attachment or feeling of obligation to a parent, regardless of whether they have been abused by said parent;" and (4) "given the great amount of other credible evidence[, the court failed] to see how [T]rial [C]ounsel's failure to cross-examine a singular, arguably collateral issue, would have affected the outcome of the trial." *Id*.

Based on our review, we conclude the record supports the PCRA court's ruling.  *See Campbell*, 260 A.3d at 277-78.  Cavanaugh's underlying argument goes to M.M.'s credibility and the weight the jury should have afforded his testimony.  Even without any cross-examination by Trial Counsel,

M.M. clearly testified that "the last time anything happened" was in seventh grade, but in eighth grade, he "went on the truck with" Cavanaugh. N.T., 12/11/19, at 185-86.

Furthermore, Cavanaugh does not address that Trial Counsel impeached M.M. on a different issue, as follows. M.M. testified on direct examination that Cavanaugh abused him numerous times. On cross, Trial Counsel confronted M.M. with three prior statements — made in a July 2017 forensic interview, at an August 2017 "Children and Youth proceeding," and the preliminary hearing in this case — that there was only one incident of abuse by Cavanaugh. **See** N.T., 12/11/19, at 205-06. M.M. agreed that in these prior instances, he stated that the abuse occurred one time. **See id**. at 206.

Finally, Cavanaugh does not dispute the PCRA court's observation that regardless of any abuse, "a child may still have an attachment or feeling of obligation to a parent." PCRA Court Opinion, 4/23/24, at 7. The jury was free to believe all, part or none of M.M.'s testimony. **See Talbert**, 129 A.3d at 543. We agree with the PCRA court that given the totality of the trial evidence, Cavanaugh has not shown there was a reasonable probability that the outcome would have been different. **See Campbell**, 260 A.3d at 278. We conclude no relief is due on his fourth issue.

In his fifth issue, Cavanaugh avers the PCRA court erred in denying relief on his claim that Trial Counsel was ineffective for not objecting to statements,

in the Commonwealth's closing argument, that Cavanaugh "raped" D.G.

Cavanaugh's Brief at 61. We note:

> "Generally, a prosecutor's arguments to the jury" do not constitute reversible error "unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds [a] fixed bias and hostility towards the [defendant] which would prevent them from properly weighing the evidence and rendering a true verdict." "A prosecutor must have reasonable latitude in fairly presenting a case to the jury and must be free to present his or her arguments with logical force and vigor."
>
> Further, we have explained that "[o]ur review of prosecutorial remarks and an allegation of prosecutorial misconduct requires us to evaluate whether a defendant received a fair trial, not a perfect trial." A prosecutor's comments "must be examined within the context of defense counsel's conduct[,]" and "the prosecutor may fairly respond to points made" by the defense. "Moreover, prosecutorial misconduct will not be found where comments were based on the evidence or proper inferences therefrom or were only oratorical flair."

**Campbell**, 260 A.3d at 280-81 (citations omitted). Additionally, "[i]t is well settled that the jury is presumed to follow the trial court's instructions." **Commonwealth v. Williams**, 241 A.3d 1094, 1112 (Pa. Super. 2020) (citation omitted).

By way of background, we summarize that the Commonwealth's closing argument spanned fifteen pages of the trial transcript. **See** N.T., 12/12/19, at 248-262. Pertinently, the Commonwealth made the following statements:

> [D.G.] went to [Cavanaugh's wife, D.C.,] and said: Your husband, my father[,] **raped** me and I gave birth to his child. . . . .
>
> * * * *
>
> [Y]ou don't have to rely just on [J.R.'s] and [M.M.'s] testimony in this case. What else can you rely on? [D.G.'s] testimony. She

said that [Cavanaugh] sexually assaulted her, ***raped*** her, and she gave birth to his child. . . .

*Id*. at 253, 255-56 (emphases added).

In its jury charge, the trial court instructed the jury that the evidence of Cavanaugh's sexual contacts with D.G. was presented "for only one limited purpose[:] to show motive, opportunity, intent, or common scheme and plan." *Id*. at 283. The jury was not to "regard this evidence as showing that [Cavanaugh] is a person of bad character or criminal tendencies for which [it] might be inclined to infer his guilt for the" charges concerning J.R. and M.M. *Id*.

On appeal, Cavanaugh acknowledges that the trial court's jury charge, but insists "the Commonwealth blatantly disregarded the trial court's instructions and actually suggested that the jury should 'rely on' D.G.'s purported testimony that [Cavanaugh] 'sexually assaulted' and 'raped' her." Cavanaugh's Brief at 61-62. Cavanaugh reasons "there is a reasonable probability that the jury interpreted the [Commonwealth's statements] to mean that [he] had been previously convicted of 'rape' [of] D.G.," and therefore he "must have also sexually abused" J.R. and M.M. *Id*. at 64 (unnecessary capitalization omitted). Cavanaugh concludes his underlying issue has arguable merit, Trial Counsel had no reasonable basis for not objecting, and he was prejudiced.

In denying relief on this claim, the PCRA court reasoned: "While it is true that [Cavanaugh] was not technically charged with the crime of 'rape,' a

review of [D.G.'s] testimony reveals that she did not consent to the incestuous relationship with her father." PCRA Court Opinion, 4/23/24, at 8. The court thus found the Commonwealth's statements were "fair comment during closing argument," and they did not prejudice Cavanaugh in affecting the outcome of trial. ***Id***. Additionally, the PCRA court reasoned that Trial Counsel "may have had a strategic reason for not objecting to the use of the word 'rape' in order to not draw attention to the relationship between" Cavanaugh and D.G. However, "despite . . . having the burden to prove his claims, [Cavanaugh] failed to call [T]rial [C]ounsel as a witness at the PCRA hearing." ***Id***.

After review of the record, we conclude the record supports the PCRA court's decision. ***See Campbell***, 260 A.3d at 277-78. First, Cavanaugh acknowledges the trial court's jury instruction, that the jury could not consider D.G.'s testimony as evidence that Cavanaugh was "a person of bad character or [had] criminal tendencies" to commit the instant offenses. N.T., 12/12/19, at 283. We presume the jury followed the trial court's instructions. ***See Williams***, 241 A.3d at 1112. On this basis alone, we may conclude that Cavanaugh failed to establish prejudice. ***See Campbell***, 260 A.3d at 277-78.

Furthermore, despite Cavanaugh's insistence that it was D.G. who initiated their sexual encounter, D.G. clearly testified that: (1) "[t]he sexual stuff that [Cavanaugh] did" made her "uncomfortable;" (2) "the sexual abuse . . . occur[red] at the house;" and (3) Cavanaugh "tried to do [sexual] stuff

with [her], but [she] didn't like it." N.T., 12/11/19, at 49-51. The conflict in this evidence was for the jury to resolve, and the jury was free to believe all, part or none of the evidence. **Talbert**, 129 A.3d at 543. In light of the foregoing, we do not conclude that the Commonwealth's closing argument-statements alone caused the jurors to form "in their minds [a] fixed bias and hostility towards [Cavanaugh]] which would [have prevented] them from properly weighing the evidence and rendering a true verdict." **Campbell**, 260 A.3d at 281.

Finally, we do not disturb the PCRA court's rationale that Trial Counsel may have had a reasonable basis for not objecting to the Commonwealth's closing argument, but Cavanaugh failed to call Trial Counsel to address this issue. **See Reyes-Rodriguez**, 111 A.3d at 783-84; **see also Campbell**, 260 A.3d at 277-78. We conclude that no relief is due on Cavanaugh's final issue.

Having determined that none of Cavanaugh's claims merit relief, we affirm the order of the PCRA court denying his PCRA petition.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 1/13/2025